UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-80219-CR-CANNON

UNITED STATES OF AMERICA

vs.

MICHAEL GORDON DOUGLAS,
    a.k.a. "DaddyBreedsFam,"
    a.k.a. "Michael,"

                **Defendant.**
_____/

**GOVERNMENT'S APPEAL OF MAGISTRATE'S ORDER DENYING MOTION FOR PRETRIAL DETENTION AND SETTING CONDITIONS OF PRETRIAL RELEASE AND REQUEST FOR STAY OF MAGISTRATE'S ORDER PENDING DISPOSITION OF THIS APPEAL AND MEMORANDUM OF LAW**

Pursuant to 18 U.S.C. § 3145, the United States of America, by and through the undersigned counsel, hereby files this motion for revocation of the order of bond set by the Honorable Magistrate Michael S. Berg of the Southern District of California ("S.D.C.A.") as to defendant Michael Gordon Douglas ("defendant" or "DOUGLAS").

On December 4, 2023, a federal complaint and warrant were issued charging DOUGLAS with seven (7) counts of distribution of child pornography, in violation of 18 U.S.C. § 2252A(a)(2) & (b)(1) in case number 23-MJ-8589-RMM (MJ DE 1, 2). The defendant was arrested on December 12, 2023 in S.D.C.A. (case no. 23-MJ-4483-MSB (S.D.C.A.) (hereinafter "SDCA Case") (Exhibit 1: Docket Sheet). On December 13, 2023, DOUGLAS's initial appearance was held in S.D.C.A. and the United States moved for pretrial detention pursuant to 18 U.S.C. § 3142(e)(1), based upon danger to the community and risk of flight. Moreover, because the defendant was charged with a violation of 18 U.S.C. § 2252A(a)(2) & (b)(1), there was a

presumption of detention. *See* 18 U.S.C. § 3142(e)(3)(E) (SDCA MJ Case, DE 3,5). The Court appointed the Federal Defender to represent DOUGLAS.

In the morning of December 19, 2023, a Federal Grand Jury sitting in the Southern District of Florida returned an Indictment charging with seven (7) counts of violating 18 U.S.C. § 2252A(a)(2) & (b)(1), distribution of child pornography having *previously been convicted* of felony distribution of matter depicting person under 18 in sexual conduct, in violation of Cal. Penal Code § 311.1(a), felony possession of matter depicting person under 18 in sexual conduct, in violation of Cal. Penal Code § 311.1(a), and attempted harmful matter sent to minor via electronic means, in violation of Cal. Penal Code § 288.2(b) and 664. DE 7.

On December 19, 2023, Magistrate Judge Berg, S.D.C.A., granted the government's motion for pretrial detention. Thereafter, DOUGLAS privately retained contain who filed a motion for a *second and subsequent* bond hearing. On January 25, 2024, after a hearing, Magistrate Judge Berg overturned his ruling and granted a $100,000 bond. The government was granted a 48-hour period to obtain a stay from this Court, which was granted. This appeal of Magistrate Judge Berg's order setting bond now follows.

### B.   FACTUAL BACKGROUND

The facts are detailed in the 17-page complaint. DE 1. On October 3, 2023, an undercover agent (UCA) in West Palm Beach, Florida—assuming the persona of a twenty-nine-year-old female with an eight-year-old daughter while acting in an undercover capacity—began receiving private communication from Defendant. *Id.* Over the next few months, the Defendant messaged the UCA using the social networking application Kik and communicated nearly endlessly, sending dozens of videos and photos of child pornography. *Id.* The Defendant also openly expressed his desire and intent to rape UCA's eight-year-old daughter, discussing plans to visit the two and

describing in detail how he would use specific sex toys and a speculum on the child before engaging in intercourse. *Id.*

On December 12, 2023, Defendant was set to make specific arrangements to meet with UCA and her daughter at a hotel in Carlsbad, California, near Legoland—an area where Defendant suggested they meet. *Id* at 4. That same day, Homeland Security Investigations ("HSI") agents encountered Defendant driving with a female in the front passenger seat. After observing Defendant commit several traffic infractions while attempting to flee law enforcement surveillance, HSI agents eventually executed a stop on Defendant's vehicle after activating emergency lights and sirens. *See* Exhibit 3:4-5 (Transcript of 1st Bond Hearing: proffer by the United States). Once Defendant's vehicle was surrounded, HSI agents, wearing vests displaying "HSI" and "POLICE," immediately provided police announcements and order Defendant not to move. But Defendant disobeyed. He ducked behind the dash of his vehicle and reappeared displaying a grenade in his hand. At the same time, the female in the front passenger seat of Defendant's vehicle threw herself out of the vehicle onto the pavement and began frantically screaming: "HE IS GOING TO KILL US," "HE IS CRAZY" and "GRENADE." *Id*. at 5.

More than a minute passed as HSI agents, with weapons drawn on Defendant, attempted to clear the surrounding area while commanding Defendant to surrender. Finally, Defendant placed the hand grenade on the dashboard and exited the vehicle. Only after a bomb squad was deployed were HSI agents ultimately able to determine that the grenade was in fact a replica. *Id*. After Defendant was handcuffed, a search incident to arrest revealed, among other personal belongings, multiple knives on his person. *See id*. at 7.

### B.      PRE-TRIAL DETENTION HEARING

In the afternoon of December 19, 2023, Magistrate Judge Berg conducted a pretrial detention hearing and *granted* the government's motion. The government and defendant proceeded by proffer (*See* Exhibit 3). The Court offered that it had in fact read the complaint. *Id* at 3. The government, then provided the Court with additional facts that occurred in the week between the signing of the complaint and the defendant's arrest:

1. The defendant "talked about his excitement at wanting to meet the child, the circumstances and what he was going to do with the child. There was specific discussions about specific sex toys and the use of a speculum";
2. "a video that was transmitted to the undercover of Mr. Douglas masturbating and ejaculating on lingerie"

*Id.* at 3-4. Regarding the day of his arrest, the defendant:

1. "was set to make arrangements to meet with what he thought was the child and her mother at a hotel in Carlsbad, at Legoland; an area that he suggested they meet";
2. made "a recorded phone call where he makes it clear that he very much wants to meet with this child, and do the things that he has promised to do";
3. "engaged in a chase with HSI when they attempted to make contact with him";
4. "engaged [aftermarket] lights and engaged in a chase with agents";
5. Upon being stopped, "proceeded to display a grenade. While [an] adult woman [ ] in the car, she apparently fell out of the car, screaming, 'He's going to kill us. He's going to kill us all";
6. "after bomb squad was called out, [they] determined that the grenade was in fact a replica";

*Id.* at 4-6. Upon his arrest, law enforcement found "a bag in place that contains a teddy bear, as Mr. Douglas had promised the undercover he was going to provide; a speculum that he was going to use on the 8-year-old to stretch her out, were his words; various sex toys, including anal beads and a bullet, which were referenced in the chat; and the lingerie, which the video was sent to the undercover…" *Id.* at 6-7. The government noted that the defendant's prior conviction, which significantly increases his minimum and maximum sentences, stemmed from a conviction where

4

in his distributed child pornography to an undercover officer, that he has a prior arrest for DUI and evading arrest. *Id.* at 6. The government added that the defendant admitted to infrequent use of methamphetamine and cocaine, and as recent as within the past week. *Id*. at 7. Regarding work, the government provided that the defendant works for a "not-for-profit that he runs" and makes approximately $50 per month. *Id.* When asked by the Court, the government provided the sentencing guidelines range to be an estimated 210 to 240 months. *Id*. at 8.

DOUGLAS' Federal Defender requested a $50,000 bond secured by the family home, adding that the defendant's mother and aunt were in the courtroom. *Id*. at 9. DOUGLAS offered that he helps around the house to take care of his aging mother and aunt. *Id.* He suggested that his flight during his arrest may have been due to being unaware that he was chased by law enforcement. *Id*. at 10. He proffered that he successfully completed five years' probation from a 2011 child pornography conviction and was deemed rehabilitated in 2021, removing him from the sex offender registry. *Id.* He suggested he made have a defense to the charges in that another person living in the defendant's home had access to his devices. *Id.* at 11.

The government replied to this last argument that, the complaint, as outlined below alleged that the defendant sent, "self-identifying photos of Mr. Douglas engaged in masturbatory acts that he sent to the undercover right around the same time he was sending child pornography as well." *Id.* at 12.

The Court also had access to the pretrial services report, which recommended detention and included information on Defendant's physical health, including reported medical issues with his knee, neck, and back. SDCA Case, DE 21:4.

In ordering detention, the Court stated, "I do believe the Government has met their burden by both clear and convincing evidence as to danger to the community and preponderance of the

5

evidence that you would be a serious risk of flight if you were released" (Exhibit 3:13). After pronouncing the order, the defendant made statements that were not discernible to the transcriptionist. But in response, the Court stated, "I, unfortunately, have made the bond determination already" and then, "I understand. But your attorney has done an admirable job today." *Id*. at 14.

In his written order, completing AO form 472 (Exhibit 2; SDCA Case, DE 10), Magistrate Judge Berg ordered "the defendant must be detained pending trial because it finds:

> by clear and convincing evidence that the Defendant is a danger and that no condition or combination of conditions of release would assure the safety of any other person and the community.
>
> by a preponderance of the evidence that there is a serious risk the Defendant would flee if released pending trial and that no condition or combination of conditions of release would reasonably assure the Defendant's appearance as required.

The court based its decision on the following: "the weight of evidence against the defendant is strong, but is the least important factor"; "subject to lengthy period of incarceration if convicted"; "prior criminal history"; "history of violence or use of weapons"; "lack of stable employment"; "lack of significant community or family ties to Florida, the charging district"; "prior attempt(s) to evade law enforcement"; and "prior sex offense conviction". *Id.*

After several continuances of the identity hearing, the defendant retained private attorney John David Kirby who entered his appearance on January 4, 2024 (SDCA Case, DE 16). On January 22, 2024, Mr. Kirby filed a motion asking the court to reconsider its detention order and to set bond (SDCA Case, DE 18) (Exhibit 4), as well as an affidavit by the defendant (SDCA Case, DE 20) (Exhibit 5). His grounds for release were as follows: 1) his aunt had taken a fall sometime after Defendant's last appearance in court, "br[eaking] her eye socket" and "sustain[ing] a brain bleed" (SDCA Case, DE 18:2; DE 20:2); 2) he was "physically assaulted three times while in

custody" (SDCA Case, DE 18:7; DE 20:2); and 3) "he will need surgery to protect his thinning spinal cord in a year to eighteen (18) months to avoid paralysis" (SDCA Case, DE 18 at 8; DE 20 at 1-2).

The Court conducted a *second* bond hearing on January 25, 2024 (*See* Exhibit 7 – Transcript 2). Mr. Kirby, beyond reasserted the claims in his motion, added the defendant has stable employment waiting for him in a state liquidation business. *Id.* at 4. However, neither the employer nor an affidavit from the employer was presented. Mr. Kirby offered he had emailed the jail where DOUGLAS was held about the defendant being assaulted "and they emailed me back" but offered no such email in evidence or what the email from the jail contained. *Id.* at 5. He averred that remaining in jail in this case or being transported to Florida by the U.S. Marshalls could cause DOUGLAS significantly more injury to his spine. *Id.* at 6. When offering bond as a substitute to detention, the Court responded, "I don't use GPS's anymore after the last two individuals last week cut them off." *Id.* at 7.

In its opposition to bond, the government reminded the court that it may only reconsider its detention order if, "information exists that *was not known to the movant at the time of the hearing* and that has a *material bearing* on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community", citing 18 U.S.C. § 3142(f) (SDCA Case, DE 21) (Exhibit 6 at 2). As to the new injury to the DOUGLAS' Aunt, the government reasoned that this did not impact his danger to the community or flight risk, and that the Court was already aware of the aid he provided to his Aunt (which did not prevent him from committing his charged crimes). *Id.* at 5-6. Second, the government offered that the jail did not locate any evidence of the defendant's claims of being assaulted, and even if true did not impact his danger to the community or flight risk and would be

7

solved the sooner he was sent to Florida. *Id.* at 6. Finally, the government noted that the defendant had not provided a shred of evidence as to his inability to receive proper medical care in the jail, his jail medical records (provided under seal) "contradict his representation to this Court," and DOUGLAS admitted he was aware of his "condition" prior to his arrest. *Id*. It goes without saying, that even if true, this did not impact his danger to the community or flight risk – including from law enforcement on the day he was arrested.

At the bond hearing, the government responded to DOUGLAS' arguments and added more context to its response. *See* Exhibit 7 at 8. In regards to the "alleged assault," the defendant did go to the hospital for an unknown reason but, "requested to come back to his original housing unit, and he claims that he was not in fear of his safety." *Id.* No records existed as to an assault, but his cell mate was changed upon his request. *Id.* at 9. And regarding his physical condition, "Immediately upon noting neck pain after he was playing [sic] while in custody, the doctors sent Defendant to the ER, and he received an MRI. And those MRI results on the 12th indicated that there was no – nothing urgent. There was no -- there was no evidence or nothing to substantiate the claims that he would not receive adequate medical care." *Id.*

The Court, over the government's objection, then ordered a $100,000 bond secured by a "trust deed to the United States", co-signed by one financial responsible party, the Adam Walsh restrictions and other conditions, including GPS monitoring with home detention. *Id*. at 11, 14-15; Exhibit 8 – Release Order. The defendant admitted identity and waived his Rule 5 transfer to the Southern District of Florida (SDCA Case, DE 26; *See* Exhibit 7:2-3).

The United States requested a stay, which Magistrate Judge Berg granted for 48 hours. This Honorable Court granted a temporary stay the same day (DE 9) pending this formal appeal

by the government.[1]

### C. STANDARD OF REVIEW

"A district court reviews *de novo* a magistrate judge's pre-trial release order." *United States v. Megahed* 519 F. Supp. 2d. 1236, 1241 (M.D. Fla. 2007); *see also United States v. Hurtado*, 779 F.2d 1467, 1481 (11th Cir. 1985). "Review by the district court contemplates an independent consideration of all facts properly before it." *Megahed*, 519 F. Supp. 2d. at 1241. The law governing the appeal of a bond order is 18 U.S.C. § 3145(a) (hereinafter "section 3145"):

> (a) Review of a release order—If a person is ordered released by a magistrate judge, or by a person other than a judge of the court having original jurisdiction over the offense and other than Federal appellate court—
>
> (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release; and
>
> (2) the person may file, with the court having original jurisdiction over the offense, a motion for amendments of release.
>
> The motion shall be determined promptly.

This Court has jurisdiction over the matter, despite the bond being issued by a magistrate judge in the district where the defendant was arrested. *See United States v. Torres*, 86 F.3d 1029, 1031 (11th Cir. 1996) (noting, with a stay issued by a district court of another jurisdiction, that "[t]he plain language of section 3145 dictates that the district court with original jurisdiction over the offense, *i.e.*, the prosecuting district ... is the only proper one to review [a release order]").

### D. LEGAL STANDARD

Pretrial detention is guided by 18 U.S.C. § 3142, which instructs that there is a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance

---

[1] The United States respectfully requests this Court to continue the stay until the Court can review this matter.

9

of the [defendant] and the safety of the community" where, like here, the defendant has been charged with crimes involving minor victims, in violation of 18 U.S.C. § 2252A. *See* 18 U.S.C. § 3142(e)(3)(E). Accordingly, DOUGLAS bears the burden of producing evidence sufficient to rebut the presumption . *See, e.g.*, *United States v. Downs*, 406 F. Supp. 3d 1314, 1317 (N.D. Fla. 2019). And assuming *arguendo* that he overcomes that presumption, it still "remains in the case as an evidentiary finding militating against release, to be weigh[ed] along with other evidence relative to factors listed in section 3142(g)" in determining whether the government has shown by a preponderance of the evidence that he is a risk of flight or by clear and convincing evidence that he poses a danger to the community. *See United States v. Quartermaine*, 913 F.2d 910, 915-17 (11th Cir. 1990); 18 U.S.C. § 3142(f). These § 3142(g) factors include the nature and circumstance of the offense, the weight of the evidence, the defendant's history and characteristics, and the danger the defendant poses to the community.

### E.     ARGUMENT

For the reasons articulated below the Court should revoke the Magistrate Judge's release order and detain the defendant pending trial.

At issue here, is simply whether the information provided at the *second and subsequent* bond hearing was "*was not known to the movant at the time of the hearing* and that has a *material bearing* on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community". 18 U.S.C. § 3142(f).  That is because Magistrate Judge Berg had already ruled initially in favor of detention, and only altered his decision based upon the *second and subsequent* bond hearing. Since all of the information presented at the *second and subsequent* bond hearing was either 1) previously known to the defendant; or, not material on the issue whether there are conditions of release that

will reasonably assure the appearance of such person as required and the safety of any other person and the community, the bond order should be revoked and the defendant should be held in pretrial detention.

As an initial matter, the defendant cannot rebut the statutory presumption that he is a danger to the community and a risk of flight. In light of the extremely serious nature of his offense and the lengthy term of incarceration he faces, the facts he argued during his *second and subsequent* bond hearing are insufficient to overcome Congress's recognition in § 3142 that offenders like him pose a significant danger to the community. Indeed, the evidence indicates that his putative custodian—his mother and aunt—do not have the ability to look after or monitor him. Nor is it sufficient to overcome the presumption that the defendant is a risk of flight—particularly given that DOUGLAS has no ties to the Southern District of Florida, is facing a substantial sentence, and has a history of drug issues, convictions for nearly identical crimes, and flight from law enforcement bear on his risk of non-appearance.

But even if the presumption in favor of detention was not applicable here, it is nevertheless clear based on an independent assessment of the evidence that each of the factors listed in 18 U.S.C. § 3142(g) weigh heavily in favor of detaining the defendant pending trial.

**1. The nature and circumstances of the offense charged.**

Congress has recognized the dangerousness of those who child pornography. *See* 18 U.S.C. § 3142(f)(1)(E). Additionally, Congress specifically directs courts to consider whether a minor victim was involved in the crime when conducting a pre-trial detention determination. 18 U.S.C. § 3142(g)(1). Congress's directive should come as no surprise: crimes involving the sexual exploitation of children are particularly egregious. And crimes that involve material depicting such sexual exploitation are no different. This material represents the continuing victimization of the

children depicted in the images and videos, which are in essence, crime scene images.

Here, in looking at the circumstances of the crime, not only were many children involved, but the defendant was personally responsible for the distribution of prepubescent children being sexually exploited. In communicating with the UCA, DOUGLAS was brazen enough to send live photos and videos of himself in an effort to validate his identity so as to meet with the UCA and her 8 year old child for sex.

Dangerousness in the child pornography context includes the "ability, if [the defendant] is released on bail, to attempt to possess additional child pornography, or to communicate and interact with (via email, internet, or phone) others involved in the possession, sale, and distribution of child pornography or other sexual abuse of children, which would also create a clear danger by facilitating the criminal and dangerous exploitation of children by other individuals." *United States v. Reiner*, 468 F.Supp.2d 393, 397 (E.D.N.Y. 2006). Thus, the danger a defendant like DOUGLAS poses to a community is not only captured by the risk that the defendant will physically abuse or harm a child; it also encompasses online dangers as well.

The danger and risk-of-flight analysis must be made in light of the federal charges against the defendant. DOUGLAS is now facing a significant sentence in the federal system, which also must be considered in the risk-of-flight analysis. He faces a minimum mandatory sentence of fifteen years and maximum sentence of forty (40) years' imprisonment as to each of the seven counts in the Indictment, with a presumed Guideline Range of 210 – 262 months if convicted. The mandatory minimum sentences, along with the potential sentencing enhancements the defendant faces after conviction, provide the defendant with a strong motivation to flee. *See United States v. Diaz*, 777 F.2d 1236, 1238 (7th Cir. 1985) (recognizing that persons facing heavy sentences for

particular types of offenses are likely to flee).

### 2.     The weight of the evidence against the person.

The evidence against the defendant is strong, as there is direct evidence of the defendant's guilt from his communications with the UCA here in the Southern District of Florida. It is not disputed that there is probable cause that the defendant distributed child pornography. Yet it appears the Magistrate Judge seemed minimize this from his consideration even in the original order granting pretrial detention indicating, "the reasons for detention include the following: 'weight of evidence against the defendant is strong, but is the *least important* factor" (emphasis added) (DCA MJ Case, DE 10). This suggests the Court may have ignored weight of the evidence from the calculous of release at the second hearing.

### 3.     The history and characteristics of the defendant.

The defendant's criminal history is one of the driving factors in favor of detention, but appears to be forgotten by the California Court. DOUGLAS was convicted in San Diego, California in 2011 for three counts of felony distribution of child pornography and attempting to send harmful material to an undercover police officer. He also was convicted in that same case of possession of child pornography. His 5-year probationary term was terminated in 2016 and his entire 2-year prison term was suspended. In 2021 he was removed from the California sex offender registry having been "rehabilitated."

DOUGLAS, as charged, is now a repeat offender. His history and characteristics confirm his continued and long standing danger and demand detention.

### 4.     The nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.

The defendant is facing serious charges involving the distribution of child pornography.

Crimes involving child pornography have been long thought of as among the most heinous criminal offenses seen in our society. *See, e.g.*, *New York v. Ferber*, 458 U.S. 747, 759 n.10 (1982) ("pornography poses an even greater threat to the child victim than does sexual abuse or prostitution" (internal quotations omitted)). As the *Ferber* Court explained, "the distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children." *Id.* at 759; *see also United States v. Norris*, 159 F.3d 926, 929 (5th Cir. 1998) ("The simple fact that the [pornographic] images have been disseminated perpetuates the abuse initiated by the producer of the materials"). And although the defendant may assert, and would be correct, that distribution of material depicting the sexual abuse of a child is not exactly the same as physical sexual abuse, child pornography is the memorialization of that sexual abuse. It is used for the personal sexual gratification of men like the defendant. It is used to entice and coerce other children into acts of sexual abuse. It is used as an item of barter between like-minded child sex offenders. It is used to encourage other child sex offenders to physically abuse other children for the purpose of producing more child pornography.

And once released onto the internet, it lives on forever. It haunts the children depicted in the material, who live daily with the knowledge that countless men like defendant use memorializations of their worst experiences in life for the reasons noted above.

Congress also found that the mere existence of these types of depictions of children, as well as their production and distribution, "creates the potential for many types of harm in the community and presents a clear and present danger to all children; and it inflames the desires of child molesters, pedophiles, and child pornographers who prey on children." H.R. 4123, "The Child Pornography Prevention Act of 1996", Sec. 10. In *United States v. MacEwan*, 445 F.3d 237,

249-50 (3d Cir. 2006), the court held that "Congress found little distinction between the harm caused by a pedophile, be he a distributor or mere consumer of child pornography." The mere "existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children." *United States v. Davin*, No. 12-10141-EFM, 2012 WL 2359419, at *3 (D. Kan. June 20, 2012) (quoting the Child Pornography Prevention Act of 1996 Pub. L. No. 104–208, § 121, 110 Stat. 3009, codified at 18 U.S.C. § 2251, ("the Act")). In addition to the danger that they present to all children, child-pornography offenders like DOUGLAS perpetuate the abuse specifically suffered by the children depicted in the images that they collect and share with others. As the Fifth Circuit has stated, "[t]he 'victimization' of the children involved does not end when the camera is put away." *Norris*, 159 F.3d at 929. "[B]ecause the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulated within the mass distribution system for child pornography." *Ferber*, 458 U.S. at 759, n.10.

It is for these reasons that Congress has recognized that child pornography "is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved," because it creates a permanent record of the child's abuse and allows for the continued victimization of that child. *See* The Act at §§ 121(1) & (2). Thus, it has created a statutory scheme that imposes significant sanctions—including lengthy terms of incarceration—for offenders like the defendant who engage in the advertisement and distribution of child pornography.

Further, studies suggest that the criminal and perverse mindset of a child pornographer is similar to or the same as that of a hands-on offender. One study found that 85% of child

pornographers had already been hands-on offenders. *See "*The 'Butner Study' Redux: A Report of the Incidence of Hands-on Child Victimization by Child Pornography Offenders" (2009).

The evidence also sufficiently establishes that the defendant is a risk of flight. The significant sentence he is facing, his drug use, his flight from law enforcement during this arrest, and his threatened use of what was believed to be a real grenade, all demonstrate by a preponderance of the evidence that the defendant is a risk of flight. To release this defendant to live with his mother and aunt and GPS alone is inconsistent with the provisions and intent of the Bail Reform Act. In fact, "[n]either electronic monitoring nor the GPS system of surveillance defeats the resolute, resourceful, energetic, and non-compliant releasee." *Megahed*, 519 F. Supp. 2d. at 1244. This defendant's willingness to commit the charged crimes while living with his mother and aunt and having previously been convicted of similar crimes, indicates that he is resolute in his non-compliance with the law and neither his appearance in court, nor the safety of this community, will be ensured if he is released on a bond of house arrest.

Judge Lawson, Senior District Judge for the Middle District of Georgia, tackled a nearly identical case and government appeal. In *United States v. Bivins*, 2011 WL 2182239, at *1 (M.D. Ga. June 3, 2011), the defendant was arrested on a 4-count indictment charging distribution and possession of child pornography. The magistrate judge released Bivins on bond despite the government's request for detention based solely on Bivins being a danger to the community. *Id.* at *2. The release was stayed pending appeal by the Judge Lawson who systematically examined the four factors for release, pursuant to 18 U.S.C. § 3142(g). *Id.*

First, in considering the nature of the offense, Judge Lawson noted that distribution and possession of child pornography are "crimes involving minor victims" and Congress considers

these crimes "significant in terms of dangerousness." *Id.* Judge Lawson observed that "Bivins was more than a mere observer in the child pornography world and instead was an active player. The first factor weighs in favor of detention." *Id*. So, too, does it here.

Second, Judge Lawson looked at the weight of the evidence against Bivins. *Id.* He noted that the evidence of his commission of these crimes was strong. *Id.* This also mirrors the case against DOUGLAS.

Third, the Court considered Bivins character and history. *Id*. at *3. Weighing in favor of detention was what Judge Lawson described as Bivins's "obsess[ion] with obtaining child pornography and [his] interest in making contact with children to engage in sexual relations." *Id.* Bivins chatted with others about sexual relations with children. *Id*. Bivins was found with other devices at the time of his arrest when his original devices were previously seized by law enforcement. *Id.* On the other hand, Judge Lawson noted that Bivins had no criminal history, driver's license, firearms, assets, or children in his home. *Id.* Judge Lawson also noted that Bivins could be outfitted with electronic monitoring and a limitation on his internet access. Nevertheless, Judge Lawson determined that the scale weighed against Bivins because he "found ways to acquire internet access in the past after his computers were seized." Moreover, Judge Lawson opined that because of his previous chats about the sexual abuse of children, "even if Bivins does not access or distribute child pornography while released, the Court is considered [sic] that Bivins might act out if deprived of viewing child pornography." *Id.* For months, DOUGLAS distributed child pornography to the UCA and discussed how he wished to rape the UCA's 8-year-old daughter, setting plans to meet both of them in his hometown – a place he wishes to live pending the outcome of this case.

Fourth, Judge Lawson pondered the "nature and seriousness of the danger to a person and the community that would be posed by Bivins' release." *Id.* Given the nature of the charges against Bivins, Judge Lawson correctly observed that, "if Bivins was released and obtained child pornography or made contact with children, his conduct would further the exploitation of children in the child pornography market or would cause a child or children to suffer devastating consequences." *Id.* Judge Lawson summed up his decision not to release Bivins as follows:

> The Court is hesitant to release back into the community a defendant who has shown a persistent determination to access child pornography and interest in having sexual relations with minors. Based on his history, the Court is persuaded that Bivins will likely engage in similar conduct despite electronically monitored home confinement and a prohibition on computer possession.

*Id.*

In each and every way, DOUGLAS' charges, his history and characteristics, and the seriousness of the danger he poses to the community if released are similar to—if not more aggravated than—Bivins's, such that his bond should be revoked. This Court need consider the charges and this defendant for what he is in the context of dangerousness and flight. The issues raised at the *second and subsequent* bond hearing were either known DOUGLAS at the time of the first hearing or did not have a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community. 18 U.S.C. § 3142.

More recently and in the Southern District of Florida, District Court Judge Rosenberg overturned an out-of-district denial of pretrial detention for a defendant who distributed child pornography through the online social-networking application, Kik. *See United States v. Vandyke*, 22-CR-80127-RLR, Docket Entry 22.

Given his proclivities in to distribute child pornography and solicit sex with an 8 year old girl, and his history and characteristics, DOUGLAS has not overcome the statutory presumption in favor of detention here; and, even assuming that he has, the government has still proven by the required standards that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]", despite the assertions made in his *second and subsequent* bond hearing. 18 U.S.C. § 3142(e).

### F.     CONCLUSION

For the reasons above, the government submits that the defendant should be detained pending trial. The United States further requests this Court to continue the stay of the magistrate judge's release order until a review by the Court can be completed.

>
> Respectfully submitted,
>
> MARKENZY LAPOINTE
> UNITED STATES ATTORNEY
>
> By:   *s/ Gregory Schiller*_____
> GREGORY SCHILLER
> Assistant United States Attorney
> Court Id No. A5501906
> U.S. Attorney's Office - SDFL
> 500 S. Australian Ave., Suite 400
> West Palm Beach, Florida 33401
> Telephone: (561)209-1045
> E-mail: gregory.schiller@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 29, 2024, the undersigned electronically filed the foregoing document with the Clerk of the Court using CM/ECF, a copy of which was also emailed to John D. Kirby, 110 W. A Street, Suite 1100, San Diego, CA 92101, via email at jkirby@johnkirbylaw.com.

*s/ Gregory Schiller*
Gregory Schiller
Assistant United States Attorney