```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3   UNITED STATES OF AMERICA,        )
                                      )  No. 3:23-MJ-4483-MSB
 4            Plaintiff,              )
                                      )
 5   v.                               )  December 19, 2023
                                      )
 6   MICHAEL GORDON DOUGLAS,          )
                                      )  Courtroom 2A
 7            Defendant.              )
     _____)  San Diego, California

 8

 9            TRANSCRIPT OF DIGITALLY RECORDED PROCEEDINGS

10                       (Detention Hearing)

11      BEFORE THE HONORABLE MICHAEL S. BERG, MAGISTRATE JUDGE

12

13   APPEARANCES:
     FOR THE PLAINTIFF:        AMANDA GRIFFITH
14                             Assistant U.S. Attorney
                               U.S. Attorney's Office
15                             Southern District of California
                               880 Front Street, Room 6293
16                             San Diego, CA  92101-8893
                               (619)557-5610
17

18   FOR THE DEFENDANT:        CASSIDY HEVERLING
                               Assistant Federal Defender
19                             Federal Defenders of San Diego
                               225 Broadway, Suite 900
20                             San Diego, CA  92101-5008
                               (619)234-8467
21

22

23   COURT REPORTER:           AMANDA M. LeGORE
                               RDR, CRR, CRC, FCRR, CACSR
24                             U.S. District Court
                               333 West Broadway, Suite 420
25                             San Diego, CA 92101
                               amanda_legore@casd.uscourts.gov
```

```
 1              (Tuesday, December 19, 2023; 3:14 p.m.)

 2

 3                    P R O C E E D I N G S

 4

 5          THE CLERK:  Calling matter number six, 23-MJ-4483,

 6  United States of America versus Michael Gordon Douglas.

 7          ATTORNEY GRIFFITH:  Good afternoon, your Honor.

 8  Amanda Griffith appearing on behalf of the United States.

 9          ATTORNEY HEVERLING:  Good afternoon, your Honor.

10  Cassidy Heverling from Federal Defenders, on behalf of the

11  person charged.  That's Michael Douglas.

12          THE COURT:  And that is you, sir?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Good afternoon.

15          Okay.  And this is set for a detention hearing?

16          ATTORNEY GRIFFITH:  Yes, your Honor.

17          THE COURT:  And it's going forward?

18          MS. GRIFFITH:  Yes, your Honor.

19          THE COURT:  Okay.  Go ahead.

20          ATTORNEY GRIFFITH:  Your Honor, we're moving on risk

21  of flight and danger to the community.

22          We would note that the complaint alleges a case that

23  carries presumption of detention.  I would also note for the

24  Court, and I've shared it with defense counsel, that

25  Mr. Douglas was just recently indicted this afternoon in the
```

1  Southern District of Florida.  So he is now no longer just

2  facing a complaint but an actual Indictment that mirrors the

3  charges in the complaint.

4          The facts and circumstances surrounding this case,

5  your Honor -- I know that the complaint was lengthy.  So your

6  Honor is aware --

7          THE COURT:  I actually read it.

8          ATTORNEY GRIFFITH:  I understand.  And the general

9  information is there.

10         I would note that the complaint ceases communication

11 at least a week before we were able to actually arrest

12 Mr. Douglas.  And the communications in that week continued in

13 fervor, as Mr. Douglas was anticipating meeting with the

14 undercover agent -- or he didn't know they were undercover at

15 the time -- and her eight-year-old child.

16         He repeatedly, in those continued communications --

17 which were not detailed in the complaint -- talked about his

18 excitement at wanting to meet the child, the circumstances and

19 what he was going to do with the child.  There was specific

20 discussions about specific sex toys and the use of a speculum.

21         There was also a video that was transmitted to the

22 undercover of Mr. Douglas masturbating and ejaculating on

23 lingerie, which will be significant here in a second.

24         So the facts and the circumstances regarding this

25 case, I think, clearly establish that he poses a danger to the

1   community.

2         Regarding the specific arrest, Mr. Douglas was set to

3   make arrangements to meet with what he thought was the child

4   and her mother at a hotel in Carlsbad, at Legoland; an area

5   that he suggested they meet.

6         Attempts were made to set up that meet at different

7   points in time.  Mr. Douglas was, at the time of his arrest, in

8   the accompaniment of an adult woman who we believe is unhoused

9   at that particular time, and he was providing services to her

10   in an attempt to get her hotels.

11         He remained in contact with the undercover, making it

12   clear that he was being delayed but he had every intention of

13   meeting at the hotel and wanted to meet.  We even have a

14   recorded phone call where he makes it clear that he very much

15   wants to meet with this child, and do the things that he has

16   promised to do.

17         At some point in time, Mr. Douglas must have realized

18   that there was something amiss, and he engaged in a chase with

19   HSI when they attempted to make contact with him.

20         For some reason, he was driving his aunt's vehicle.

21   She's present in the court, as well as the defendant's mother.

22   And those are the individuals with whom Mr. Douglas lives.

23         But they contain aftermarket lights.  So Mr. Douglas

24   engaged those lights and engaged in a chase with agents.

25   Certainly giving the appearance that he had the right and the

1    licenses, as a law enforcement officer or something, to engage

2    in this particular chase.

3         When the --

4         THE COURT:  But he had law enforcement lights?

5         ATTORNEY GRIFFITH:  He had lights.  I don't think

6    they were red and blue.  But they certainly were lights that

7    gave people reason to believe -- my agents described it as

8    potentially construction lights, as yellow and orange.  But

9    during the chase, he engaged them himself in an effort to --

10        THE COURT:  Move traffic.

11        ATTORNEY GRIFFITH:  -- move traffic around, or make

12   it clear that he had the right of passage.

13        When, ultimately, he was able to be stopped or he

14   stopped in a parking lot, HSI agents boxed him in, commanded he

15   get out.  Mr. Douglas then proceeded to display a grenade.

16   While this adult woman was in the car, she apparently fell out

17   of the car, screaming, "He's going to kill us.  He's going to

18   kill us all."

19        It took him a lengthy period of time, while weapons

20   were drawn on him, to let go of the grenade and get out of the

21   vehicle.  They were ultimately able, after bomb squad was

22   called out, to determine that the grenade was in fact a

23   replica.  But that wasn't made clear until they were actually

24   able to put their hands on it and realize that it was not an

25   M-67-type grenade.

1          Those are the facts and the circumstances surrounding

2    it, that I think clearly demonstrate that his attempts to

3    engage with law enforcement were not well received and pose a

4    danger.

5          With respect to the -- this particular case,

6    Mr. Douglas has a criminal history, as noted in the Pretrial

7    Services report, including a prior for distribution of harmful

8    material to a minor.

9          Similar, he was engaged in an undercover sting that

10   led to that particular conviction.  Because of that prior, he

11   is now facing a 15-year mandatory minimum for each one of the

12   seven counts that he has been indicted on as of this afternoon.

13         I would also note that he does have criminal history

14   for DUI.  He also has an evading arrest.  He was able to

15   successfully complete his probation, and no longer has to

16   register on the sex offender registry because he was determined

17   to be a low risk to recidivate.  But I think the circumstances

18   and the facts surrounding his arrest today bear something

19   different.

20         I would also note that a search incident to the

21   arrest involving the vehicle revealed that there was a bag in

22   place that contains a teddy bear, as Mr. Douglas had promised

23   the undercover he was going to provide; a speculum that he was

24   going to use on the 8-year-old to stretch her out, were his

25   words; various sex toys, including anal beads and a bullet,

1   which were referenced in the chat; and the lingerie, which the

2   video was sent to the undercover, was also recovered in that

3   same bag.  So it leads to the strength of the evidence of

4   Mr. Douglas being the person who was communicating in the

5   undercover chats to be very strong.

6            I would note that he does admit to drug use of

7   methamphetamine and cocaine.  He admits he's an infrequent

8   user.  But, by his own admission, he had used both of those off

9   and on in the last week.

10           With respect to risk of flight, he has no ties to

11   Florida, your Honor.  He has no reason to show up, to go there,

12   or to face the charges there.

13           I appreciate that he is employed in a not-for-profit

14   that he runs, and makes approximately -- by his own

15   admission -- $50 a month.  But he has no other source of

16   income, and relies on his aunt and his mother.  Doesn't

17   contribute rent.

18           So the lack of employment is a concerning thing.

19   Doesn't give us reassurance that he's going to otherwise stick

20   around.

21           Make sure -- there was no other grenades found in the

22   vehicle, but there was a number of knives that were found as

23   well.

24           The woman -- the adult woman who he was in custody --

25   or company with all week -- or during that day.  Excuse me,

1   your Honor.  Not all week.  Was interviewed by law enforcement,

2   and she confirmed that Mr. Douglas had expressed his

3   frustration with her that they were unable to successfully find

4   a place for her to go because Ms. -- she was making Mr. Douglas

5   late for the very important date that he had.

6          So I think, your Honor, with the facts and

7   circumstances surrounding the case; the strength of the

8   evidence; the mandatory minimums on which this particular

9   defendant is facing; his criminal history, including a prior

10  for exactly the same conduct; his admission to methamphetamine

11  and cocaine use; not having any stable employment; no ties to

12  Florida, does not give this Court -- should not give this Court

13  any confidence that he will otherwise appear and be available

14  and not pose a risk of flight or danger to the community.

15         And unless the Court has any other specific

16  questions, I would submit.

17         THE COURT:  What are his guidelines, just out of

18  curiosity?

19         ATTORNEY GRIFFITH:  Your Honor, I believe, when

20  speaking with my colleague -- I have not run his specific

21  guidelines.  But I think he could be looking at up to the 210

22  to 240 range, depending on some of the facts and the

23  circumstances.

24         I don't have the full summary of all of the images

25  that he was accused of distributing child pornography for.  But

1    a conservative assessment would probably put it at 210 to 240,

2    based on my familiarity with 2G2.2.  And he is facing a 40-year

3    statutory maximum.

4            He also could be facing additional charges as well,

5    your Honor, related to enticement.  He is not going to be

6    facing any charges -- at least here, for right now -- regarding

7    his conduct in the escape or the threatened use of the grenade.

8            THE COURT:  Okay.  Thank you.

9            ATTORNEY HEVERLING:  Thank you, your Honor.

10            In this case, we are asking the Court to set

11    conditions of release to be secured by a property bond in the

12    amount of $50,000, which would be secured by the family home.

13            I've spoken with his mother and his aunt of --

14    (indiscernible) Patricia, who are here in the courtroom today.

15            THE COURT:  Thank you for being here.

16            ATTORNEY HEVERLING:  And they have agreed and believe

17    in my client, and -- and have agreed they're willing to post

18    that bond if it were to be granted.

19            I want to begin by addressing the flight in this

20    case.  I believe my client is not a serious risk of flight.  He

21    currently lives in Escondido with his mother and his aunt.

22            As they're getting older, he has been taking on

23    additional duties in the home, including helping with meals and

24    cleaning around the house.  So he is an asset to their

25    household.

1      With the property bond set in this case, my client

2  would not consider fleeing, and putting his mother and aunt at

3  risk of homelessness and losing their home.

4      As to the alleged flight from the officers, there are

5  factual questions at issue as to whether there were -- these

6  were marked cruisers or that he was aware that these were

7  police officers that were chasing him at that moment in time.

8      And, additionally, as Government counsel noted, the

9  grenade in this case was not operational.  The knives found in

10  the car -- you know, my client was not prepared to be arrested

11  that day.  Simply carrying a knife is not a crime.

12      In addition, he has demonstrated that he can comply

13  with court orders, as he has successfully completed five years

14  of probation for a prior conviction from 2011.  And, in fact,

15  was deemed to be rehabilitated in 2021 from those charges.  And

16  based on that information, I don't believe he's a flight risk

17  in this case.

18      In addition, he has been working in his free time to

19  set up --

20      THE COURT:  You said he what?

21      ATTORNEY HEVERLING:  Sorry.  He's been working in his

22  free time to set up a nonprofit; which works with the homeless,

23  to help find housing in the Escondido area, as well as connect

24  them to other resources in the community.  So he is quite

25  connected to his community here in Escondido.

1          And as your Honor knows, community ties need -- need

2   not be to the district where the conduct is charged.  It needs

3   just to be a community within the United States.  And, here,

4   his -- he does have quite strong ties to the Escondido area.

5          And while the weight of the evidence is the least

6   important factor, we would also like for the Court to consider

7   that there was another individual, which the Government is

8   aware of, that was living -- living in the household with my

9   client and his family during the time that -- that this conduct

10  was alleged, who had access to his devices.  So there is a

11  potential defense there, and my client is eager to litigate

12  that further.

13         And my client's mother has also informed me that that

14  individual is no longer living in that home.  So if he were to

15  be released to the home, that individual would no longer be in

16  contact with them.

17         In addition, if your Honor is not satisfied by the

18  property bond, my client has also indicated he's willing to

19  comply with additional conditions that your Honor would set,

20  including home detention or GPS monitoring, or whatever would

21  make your Honor feel comfortable in this case.  And if bond

22  were to be granted, he would be living at home with his mother

23  and his aunt, back in Escondido.

24         And unless your Honor has any other questions, I'll

25  submit.

1        THE COURT:  I don't.

2        ATTORNEY HEVERLING:  Thank you.

3        ATTORNEY GRIFFITH:  And, your Honor, just to address

4   a couple of things.  Is even though the grenade was fake, that

5   wasn't a determination that was made until after it was

6   released from the defendant's custody, and before he threatened

7   individuals.

8        The other individual adult that was living in the

9   house with Mr. Douglas and his mother and his aunt was somebody

10   that was invited there by Mr. Douglas.  It sounds like they

11   actually had a relationship with each other and had been there

12   at the consent of everybody there.

13        I would note, as alleged in the complaint, that we

14   have a number of -- a number of photos -- self-identifying

15   photos of Mr. Douglas engaged in masturbatory acts that he sent

16   to the undercover right around the same time he was sending

17   child pornography as well.  So I appreciate he might have

18   another defense with respect to the actual underlying charges;

19   the concern about Mr. Douglas being the one who is daddy breed

20   spam (phonetic) and Michael, which is the aliases alleged in

21   the complaint and were used to communicate.

22        We do believe the weight of the evidence remains

23   strong.

24        THE COURT:  Thank you.

25        Anything further?

1          ATTORNEY HEVERLING:  Nothing further, your Honor.

2          THE COURT:  Okay.  Looking at the 3142 factors, sir,

3  those factors that would weigh in favor of setting bond, as

4  opposed to those that would weigh in favor of detaining you, I

5  do believe the Government has met their burden by both clear

6  and convincing evidence as to danger to the community and

7  preponderance of the evidence that you would be a serious risk

8  of flight if you were released.

9          So, unfortunately, sir, I am going to detain you

10  during the pendency of these charges.  However, you should note

11  that if at some future point in time you either admit or

12  identity is proved against you -- and I'm not saying one way or

13  the other.  But if either of those were to happen, you would

14  have the opportunity to raise bond again in the District of

15  Florida.

16          Your next court date is set for December 26th, at

17  1:30, for removal I.D. hearing.

18          ATTORNEY GRIFFITH:  Your Honor, in communicating, I

19  didn't have a chance to check with defense counsel.

20          Is there any way we could continue it to that

21  Thursday, the 28th?

22          Would that be a problem?

23          ATTORNEY HEVERLING:  Yeah, that should be fine, your

24  Honor.

25          ATTORNEY GRIFFITH:  In speaking with the case agent,

1    my colleague, Mr. Bennett, is going to be handling it.  But the

2    case agent is going to be out on leave on the 26th.  So that

3    will give us enough time to make sure that defense counsel has

4    copies of discovery, to deal with any potential identity

5    issues.

6              THE COURT:  Is that all right with you, sir?  If we

7    put that over until the 28th?

8              THE DEFENDANT:  Yes, your Honor.  (Indiscernible due

9    to not speaking into microphone) number one (indiscernible)

10   home.

11             THE COURT:  I -- I, unfortunately, have made the bond

12   determination already.  So --

13             THE DEFENDANT:  (Indiscernible.)

14             THE COURT:  I understand.  But your attorney has done

15   an admirable job today.  And I just think it's best if you --

16             THE DEFENDANT:  (Indiscernible.)

17             THE COURT:  -- don't make any other statements at

18   this point in time.  Okay?

19             THE DEFENDANT:  (Indiscernible.)

20             THE COURT:  I understand your frustration.  So

21   your -- your ID removal hearing will be set for -- is it

22   Thursday, December 28th?

23             UNIDENTIFIED SPEAKER:  Yes, at 1:30.

24             THE COURT:  Okay.  1:30.

25             ATTORNEY GRIFFITH:  Thank you, your Honor.

1        THE COURT:  Thank you.

2        (Conclusion of proceedings.)

3                    --oOo--

4   I certify, by signing below, that the foregoing is a correct
    stenographic transcript, to the best of my ability, of the
5   digital recording of the audio proceedings had in the
    above-entitled matter this 27th day of December, 2023.  A
6   transcript without an original signature or conformed signature
    is not certified.  I further certify that the transcript fees
7   and format comply with those prescribed by the Court and the
    Judicial Conference of the United States.

8
            /S/ Amanda M. LeGore
9          _____

10       AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25