```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                    WEST PALM BEACH DIVISION
                     CASE NO. 23-cr-80219-AMC-1
 3

 4   UNITED STATES OF AMERICA,              Fort Pierce, Florida

 5                Plaintiff,                March 5, 2024

 6           vs.
                                           1:38 p.m. - 2:23 p.m.
 7
     MICHAEL GORDON DOUGLAS,
 8
                  Defendant.               Pages 1 to 32
 9   _____

10            TRANSCRIPT OF MOTION FOR RECONSIDERATION
              BEFORE THE HONORABLE AILEEN M. CANNON
11                 UNITED STATES DISTRICT JUDGE
     APPEARANCES:
12
     FOR THE GOVERNMENT:
13                            U.S. ATTORNEY'S OFFICE
                              GREGORY SCHILLER, ESQ.
14                            500 S. Australian Avenue
                              Suite 400
15                            West Palm Beach, Florida 33401

16   FOR THE DEFENDANT:
                              LAW OFFICE OF JOHN R. HOWES
17                            JOHN R. HOWES, ESQ.
                              110 SE 6TH STREET
18                            SUITE 1700
                              FORT LAUDERDALE, FLORIDA 3301
19
                              LAW OFFICES OF JOHN D. KIRBY, APC
20                            JOHN D. KIRBY, ESQ.
                              401 W. A STREET
21                            SUITE 1150
                              SAN DIEGO, CALIFORNIA 92101
22
     STENOGRAPHICALLY REPORTED BY:
23
                              LAURA E. MELTON, RMR, CRR, FPR
24                            Official Court Reporter to the
                              Honorable Aileen M. Cannon
25                            United States District Court
                              Fort Pierce, Florida
```

1          (Call to the Order of the Court.)

2          THE COURT:  Good afternoon.  You may be seated, unless

3    you are addressing the Court.

4          Let's call the case, please.

5          COURTROOM DEPUTY:  United States of America vs. Michael

6    Gordon Douglas, Case Number 23-cr-80219.

7          Will the parties please make your appearance, starting

8    with the government.

9          MR. SCHILLER:  Good afternoon, Your Honor.  Gregg

10   Schiller on behalf of the United States, and with me is

11   Homeland Security Investigations Special Agent Isha Rama.

12         THE COURT:  Good afternoon to you both.

13         MR. SCHILLER:  Good afternoon.

14         AGENT:  Good afternoon.

15         MR. KIRBY:  Good afternoon, Your Honor.  John Kirby on

16   behalf of Mr. Douglas.  He is present in custody.  Also, I'm

17   appearing pro hac vice.  Also, Mr. Howes who is a member of the

18   Bar here.

19         MR. HOWES:  Good afternoon, Your Honor.  Good to see

20   you again.  It's been a while.

21         THE COURT:  Good afternoon to all of you.  Good

22   afternoon, Mr. Douglas.  And, good afternoon, Mr. Kirby.

23         Who is here for probation?

24         THE PROBATION OFFICER:  Good afternoon, Your Honor.

25   Claire Spille on behalf of U.S. Probation.

1          THE COURT:  All right.  We are here following the

2     government's appeal of a bond order entered in the Southern

3     District of California by Magistrate Judge Berg.  I have

4     reviewed the full record, including the transcripts from the

5     two hearings, the first in December at which detention was

6     ordered, along with the subsequent reconsideration hearing when

7     the magistrate judge entered a bond in the amount of, I

8     believe, $100,000 personal surety bond, secured by a trust deed

9     to the United States, with the co-signature and additional

10    conditions.  I understand that there were some exhibits

11    provided by defense counsel to the Court.

12          Ms. Cassisi, I don't actually have a copy of those

13    defense exhibits.

14          Mr. Kirby, do you have an additional copy of the

15    medical records, I think?

16          MR. HOWES:  Your Honor, I have given them to your

17    clerk.

18          THE COURT:  Okay.

19          MR. HOWES:  I have given the government an entire set

20    of those particular documents.  We've culled down the ones that

21    are relevant to what Mr. Kirby is going to address with you

22    today.  But the government has a full set of them.

23          THE COURT:  Okay.  So we have some medical records that

24    the defense wishes to introduce.

25          Now, Mr. Kirby or Mr. Howes, beyond the medical

1   records, do you have any additional evidence you wish to

2   introduce into the record for purposes of this hearing?

3          MR. KIRBY:  No, Your Honor.

4          THE COURT:  Okay.  Let me turn to Mr. Schiller then.

5          Beyond what is already in the record, are you

6   contemplating an evidentiary hearing of any kind for purposes

7   of this appeal?

8          MR. SCHILLER:  I am not, Your Honor.

9          THE COURT:  Okay.  So you're relying on the record as

10  it currently stands; is that correct?

11         MR. SCHILLER:  Yes, Your Honor.  I believe, that's what

12  we ought to and is appropriate to be done in this matter.

13         THE COURT:  Do you have -- do you have any objection to

14  the Court's consideration of the medical records?

15         MR. SCHILLER:  No, I don't.

16         THE COURT:  Thank you.  Okay.

17         All right.  Well, then I will reopen this hearing from

18  an evidentiary standpoint only for the limited purpose of

19  receiving the supplemental exhibits filed by the defense,

20  without objection from the government.  And as far as I can

21  tell, these are health records from January of this year.  You

22  can provide more clarification for what they reveal in your

23  view, Mr. Howes or Mr. Kirby.

24         But with that, let me turn, first, to the government,

25  because it is the government's appeal for argument on the

1    motion.

2          MR. SCHILLER:  Thank you, Your Honor.  If I may

3    approach the podium.

4          THE COURT:  Yes.

5          MR. SCHILLER:  Thank you, Your Honor.

6          In fairness, I don't have too much more to add than

7    what's in the government's brief.  I believe I have touched on

8    most of the major points, but I think that what's important for

9    this Court to consider and what we're doing here today is what

10   actually happened in California, which is almost quite an

11   anomaly.

12         The Court held the defendant on pretrial detention, and

13   when the magistrate judge issued that order, he did so citing

14   the following reasons for danger to the community and risk of

15   flight.  First, he found that there was clear and convincing

16   evidence that the defendant is a danger, and by a preponderance

17   of the evidence, that there is a serious risk that he would

18   flee.

19         And then he explained why, checking off boxes that are

20   on the preprinted form, including the weight of the evidence

21   against the defendant is strong, but it is the least important

22   factor.  That appears to be unique to the Southern District of

23   California.  Our prepared -- pre-prepared bond orders here in

24   the Southern District of Florida do not say that last part of

25   it.  And, in fact, the weight of the evidence is a significant

1   factor, if not one of the most important ones, in considering

2   bond in the 11th Circuit.

3           And then the magistrate judge went over and clicked off

4   several other boxes regarding why the defendant should be

5   detained, including subject to a lengthy period of

6   incarceration, if convicted; his prior criminal history; lack

7   of stable employment; lack of significant community or family

8   ties to the Southern District of Florida; prior attempts to

9   evade law enforcement; and prior sex offense conviction.

10          Then the defendant hired private counsel who filed a

11  subsequent bond motion after this had been decided, and

12  essentially was arguing a few factors:  That the defendant had

13  suffered an injury in the jail; that his mother -- his aunt had

14  suffered an injury since he had been arrested; and he had some

15  other medical issues.  And at that bond hearing, the incident

16  at the jail, there was no evidence presented about it, other

17  than argument from counsel to suggest that the defendant had

18  suffered some injury.

19          The government even countered that fact by advising

20  that they had -- and they provided to the Court records from

21  the jail, indicating that the defendant went to medical, but

22  was fine to return back to his cell as long as he had a

23  different roommate, a cellmate, and that was it.  There was no

24  major injuries that he suffered, nothing that was presented.

25          In regards to the aunt, the defendant, through counsel,

1   had suggested to the Court that he was the one that had to take

2   care of his aunt, and now that she had suffered additional

3   injury, who would take care of her?  Well, in fact, that point

4   had really already been brought up at the first bond hearing,

5   that he was the caretaker of his aunt.  And the fact that she

6   suffered injury subsequent to his being arrested, really had no

7   effect on whether or not he would be a danger to the community

8   or a flight risk.  And the final issue, regarding his medical

9   situation, that was already brought up at the initial bond

10  hearing.

11        So the government essentially rested on the fact that

12  there was either A, nothing new; or B, nothing material to the

13  question of whether or not bond should be altered from the

14  original decision in this case.  And without really saying why,

15  the magistrate judge reversed his own opinion.

16        THE COURT:  I think as far as I can tell, the rationale

17  is as follows, he says:  "I took the new information as the

18  illness to his mother and his back/neck injury, so I am

19  reconsidering, and I'm going to set bond in this case."  So I

20  think maybe that those were the sources of information that

21  counselled his decision.

22        MR. SCHILLER:  Yes, Your Honor.  I'm sorry.  I

23  misspoke.  I mean, obviously, the judge relied on the

24  information provided by defense counsel, Mr. Kirby, and took

25  that as the reasons for now issuing bond.

1        But those reasons were not said to have been new and

2    unknown or, B, material.  And even if they were, it is still a

3    question of comparing all of the other elements for bond.  And

4    as the judge rightfully laid out all the reasons for detaining

5    Mr. Douglas originally, he didn't go back to say, well, these

6    new issues, if they were, in fact, new, which I don't submit

7    they were, somehow overcome everything else that I have already

8    found that makes him a danger and a flight risk.

9        And so for those reasons, there was really no reason

10    for the Court to overturn its original decision and why the

11    government is asking this Court to reimpose the pretrial

12    detention order.

13        I will also submit that there were a couple of

14    discrepancies that I wanted to bring to the Court's attention.

15    And defense counsel, during the motion for bond, in addition to

16    his filing of his motion, included an affidavit signed by the

17    defendant.  And in doing so -- and I believe I included it as

18    an attachment to my motion, and I apologize for the pagination

19    and the Bates-stamping at the top.  You know, when a document

20    is filed and then refiled, it kind of goes right over itself.

21    There is no way to fix that.

22        But in the affidavit by Michael G. Douglas, in which

23    he -- which he signed on January 22nd, the last line item says:

24    "I have not used any illicit drugs since 2011."  But the

25    pretrial services report done in California that we've all been

1    provided clearly indicates that the defendant relayed to

2    probation that he had been doing cocaine as recent as within

3    the past week before his arrest.  And there are other drugs

4    mentioned as well.  So that was a discrepancy.  The other --

5            THE COURT:  "Discrepancy" is an interesting word for

6    that.

7            MR. SCHILLER:  Thank you, ma'am.

8            I also want to direct the Court's attention to a

9    description about the day of the defendant's arrest.  Because

10   in defense counsel's reply to the government's appeal, they

11   wrote on page 2 -- and I will just read it, for the record.

12           At the bottom of page 2, this is docket entry 15 in our

13   case, "Mr. Douglas, as he was driving down Interstate 15,

14   noticed that he was being followed by two late-model SUVs and

15   believed that these vehicles might belong to members of the

16   drug gang that was after Crystal Lnu."  That's the passenger in

17   his vehicle.

18           "These vehicles then attempted to stop Mr. Douglas'

19   vehicle.  The vehicles did not use any red-and-blue flashing

20   lights or sirens to identify them as law enforcement.

21   Mr. Douglas, fearing that the occupants of the vehicle might

22   harm him, flashed a $2 plastic hand grenade to the occupants.

23   Once the occupants identified themselves, Mr. Douglas

24   surrendered peacefully."

25           Nothing could be farther from the truth.  This

1    incident, if I could be blunt with the Court, Mr. Douglas came

2    within seconds of losing his life, because as he held this what

3    looked like a real grenade in his hand in the car and was

4    ordered repeatedly for not just a second or a few seconds but

5    minutes to put down his hands, put down the grenade, he had

6    snipers -- well, they weren't actually certified snipers, but

7    he had law enforcement with laser lights pointed at his head,

8    ready to shoot him because there were people around him, there

9    was law enforcement around him, and he was holding on to that

10   grenade, not for a split-second, and then putting it down

11   following commands, it took a while.

12            There was a hostage negotiator on scene.  There was an

13   entire swarming of Homeland Security and local law enforcement

14   officers clearing the area, making sure nobody would get hurt.

15   And it was only, finally, that he put down the device and then

16   he came out and, you know, said to the officers, What's going

17   on?  What's this all about?

18            They clearly identified themselves by -- by identifying

19   that they were police, with their names across their vests.

20   This was an extremely volatile situation.  Dangerous not only

21   for the law enforcement officers but the civilians in the area.

22            And when we talk about danger and we look at the facts

23   of the case, what was found in the defendant's vehicle -- and

24   this was made clear at the initial bond hearing -- are all of

25   the items that the defendant was going to bring to his date

1    with the undercover agent and her notional 8-year-old child.

2    Everything from toys -- a stuffed animal to sex toys to

3    lingerie.  Everything he described that he was going to bring

4    was in the vehicle.

5         So the government is hard-pressed to understand how the

6    information provided at the subsequent bond hearing or any

7    medical situation that the defense presents to this Court

8    somehow could overcome the presumption of detention.  And even

9    if it were that somehow it overcomes the standards of clear and

10   convincing evidence and a preponderance of the evidence for

11   flight and dangerousness to the community.

12        THE COURT:  So you're maintaining both prongs; is that

13   correct?

14        MR. SCHILLER:  Technically all three, Your Honor.  The

15   presumption as well as flight and danger to the community.

16   Yes.

17        THE COURT:  But you're moving for detention on the two

18   bases, flight and danger?

19        MR. SCHILLER:  Just as we did out in California, yes,

20   ma'am.  I'm arguing nothing different than was originally

21   argued for which the magistrate judge already set pretrial

22   detention, and then reversed it based upon what I would suggest

23   are things that were already known, except for maybe the injury

24   to the aunt, and things that were not material to the question

25   of detention.  And those are the standards which we ask this

1    Court to apply, as it should.

2         THE COURT:  So at the initial hearing the government

3    proceeded by proffer; correct?  There was no agent testimony?

4         MR. SCHILLER:  Correct, Judge.  My understanding is in

5    the Southern District of California both sides typically

6    proceed by proffer and do not present witnesses.  And the Court

7    receives it that way, and the parties proceed that way as well.

8         THE COURT:  All right.  So the proffer in California

9    was that he had fled and that the officers had engaged their

10   lights and that he, nevertheless, engaged in a chase with

11   agents.  The theory that he wasn't sure whether he was being

12   pursued by law enforcement, that, I believe, was raised by the

13   defense.

14        Do you know if the magistrate ever made a finding as to

15   sort of what version he believed with respect to whether he was

16   actually evading arrest, fleeing, or whether he was under some

17   good faith misimpression.

18        MR. SCHILLER:  I'm not going to argue that the good

19   faith misimpression was not a legitimate reason for him.  I

20   don't -- I don't believe law enforcement, when they were

21   following him, because they weren't chasing him, they were

22   following him in a surveillance mode, had any kind of lights

23   and sirens on, and they were using undercover vehicles.

24        But when they finally decided to stop him, that's when

25   he did not surrender initially, and that went on for several

1    minutes, again, as the description I described above -- before.

2         THE COURT:  The description about the volatile

3    situation in the parking lot and all of that, was that

4    proffered by the AUSA in California?

5         MR. SCHILLER:  Yes, ma'am.

6         I believe on page 3 -- let me just see if I can correct

7    my notes.  Yes, I believe it's on page 3 and 4 of the

8    transcript from the original hearing.

9         "Upon being stopped, the defendant proceeded to display

10   a grenade while an adult woman in the car, she apparently fell

11   out of the car screaming, 'He's going to kill us.  He's going

12   to kill us.'  After the bomb squad was called out, they

13   determined the grenade was, in fact, a replica."

14        Probably the only parts of the scenario that were not

15   detailed were the minutes of time that went on as the law

16   enforcement officers are ordering commands to "put down the

17   device, get out of the car, show us your hands," none of which

18   the defendant followed, and he stayed in the car until finally

19   obeying the commands.

20        To that point, officers had to display flash-bangs to

21   try to disorient the individual.  That really didn't have much

22   of an effect either.

23        THE COURT:  Was there any offer of contrary proof with

24   respect to what happened once they attempted to stop the car in

25   the parking lot?

1          MR. SCHILLER:  From the defense's perspective?

2          THE COURT:  That's correct.

3          MR. SCHILLER:  I would have to go back to the

4    transcript and look.  If the Court will just give me a moment.

5          THE COURT:  I don't see a particular factual challenge

6    to that part, other than stressing that the grenade was

7    ultimately determined to be fake.

8          MR. SCHILLER:  The only thing -- and I agree with

9    Your Honor.

10         The only thing I can find is on page 10 of the original

11   transcript, and I filed this at docket entry 10-3.  On line 4

12   of the transcript the public defender says, "And as to the

13   alleged flight from the officers, there are factual questions

14   at issue as to whether there were -- these were marked cruisers

15   or that he was aware that these were police officers that were

16   chasing him at the moment in time."

17         But, again, the real confrontational issue happens once

18   they finally do stop him.

19         THE COURT:  Okay.  Now, as far as just sort of the big

20   picture, the indictment charges, I believe, it is seven counts.

21         Are they all distribution counts?

22         MR. SCHILLER:  They are, ma'am.  And each of them

23   carries a minimum mandatory of 15 years to a maximum of

24   40 years.

25         THE COURT:  And the guidelines estimated at this point

1   are still -- is it 210 or so from the original calculation?

2          MR. SCHILLER:  At the bottom of the guidelines, yes,

3   ma'am, that is the government's calculation.  I have not

4   confirmed it with probation.

5          Judge, we know -- and this was expressed at the

6   original bond hearing -- the defendant was previously convicted

7   in 2011 of having an online conversation with another

8   undercover agent and distributing child pornography at that

9   point as well.  That happened back in 2006 or so.  But by the

10  time the case finally made its way into the court, and he was

11  convicted, it was 2011 already.

12         It was then in 2021, after being a sex offender for

13  10 years, that a judge in California decided that the defendant

14  had been rehabilitated, and could be taken off the sex offender

15  registry.  These chats began with the undercover agent in 2023,

16  just a little more than two years later.

17         THE COURT:  As far as the ties to the district, is that

18  inquiry, in your view, confined to the district here, the

19  charging district, or is it a kind of broader view without ties

20  to any district?

21         MR. SCHILLER:  Well, I think it's -- I think it can be

22  tied to both districts in all fairness.  But I think it's

23  primarily tied to here, because it's this Court that's going to

24  be releasing the defendant and in hopes -- if the Court were to

25  grant a bond.  And the hope would be that, A, he doesn't commit

1    any -- he is not a danger, not only in his home community but

2    this community, but that he is not a flight risk from this

3    Court.

4          So Your Honor releasing him, the question is, is he a

5    flight risk from this Court?  If he is not living here, if he

6    doesn't have ties here, what binds him to our district?  He

7    will return to California.  And this Court will have little

8    ability to initiate anything on him immediately.  I understand

9    things can be done quickly, but without having him here in this

10   district, it seems tenuous at best.

11         The defense did mention in their reply brief that he

12   has family here, somewhere in Florida.  They don't mention

13   specifically where, or whom, and to what those relationships

14   are.  But, again, without having any of that information,

15   again, none of which was presented at the first bond hearing,

16   none of which was presented at the second bond hearing, we

17   think the pretrial detention order was rightfully entered

18   originally.

19         THE COURT:  Can you explain to me how this would work,

20   a trustee to the United States on real property approved by a

21   federal judge?

22         MR. SCHILLER:  I cannot, ma'am.

23         THE COURT:  Okay.

24         MR. SCHILLER:  And I can't only because I have never

25   been part of such a bond condition here in the Southern

1    District of Florida.

2           THE COURT:  All right.  Okay.  Thank you.

3           MR. SCHILLER:  Thank you, ma'am.

4           THE COURT:  All right.  Who will be presenting evidence

5    on behalf of Mr. Douglas?

6           MR. KIRBY:  I will, Your Honor.

7           THE COURT:  All right.  Thank you.

8           MR. KIRBY:  May I approach the podium?

9           THE COURT:  Yes.

10          MR. KIRBY:  Your Honor, initially I would note, and I

11   don't want to spend a lot of time on it, but what the

12   government referenced as to what happened after Mr. Douglas was

13   approached by law enforcement, nothing about snipers or

14   infrared vision goggles or anything like that was presented at

15   either of the hearings.

16          Basically, what happened was Mr. Douglas erroneously

17   thought he might have been tracked by some drug gang, and made

18   a bad decision to raise up a replica grenade for a few minutes.

19   When it became clear it was law enforcement, he

20   immediately -- and this is what the record says, not what

21   is -- just said today, but what the record says -- he -- he

22   surrendered.  And that's indeed what happened.  There was no

23   volatile situation.  At least not what's in the record.  It

24   doesn't say that.  What the prosecutor stated doesn't say that

25   either.  Mr. Douglas indeed surrendered.

1          But, more importantly, and what really is the crux of

2     why I'm here, Mr. -- and why the magistrate judge, upon

3     reconsideration, did grant him bond, he does have strong ties

4     to San Diego, and I think that is what this Court should

5     consider because he will be staying in San Diego.

6          And it's not as though he's going to be in a foreign

7     jurisdiction where the Court does not have the ability to have

8     him arrested.  If there is any problem with his bond, if he

9     doesn't -- you know, if he doesn't abide by the conditions,

10    it's not as though he is going to go to Mexico.  He has no ties

11    to Mexico, no ties to any other jurisdiction that's outside of

12    the Court's purview.  And I think that is what Your Honor

13    should look at.

14         He is very close to his mother.  He is very close to

15    his aunt.  He doesn't have anywhere else to go.  He -- if he is

16    released, he will stay in San Diego.  He is willing to have

17    whatever restrictions the Court wants to place, house arrest,

18    ankle monitor, have all computers taken from his home, and any

19    other restriction the Court wants.

20         The reason that he wants to be out, and it's -- it's

21    the singular consideration, is because of his -- his physical

22    condition.  He has spinal stenosis that has been -- it's in the

23    court records.  He has been told by two different doctors that

24    if he does not have surgery almost immediately, he could, at

25    any moment, become paralyzed or even die.  If he sneezes wrong,

1    if he coughs wrong, if he falls, he could immediately become

2    paralyzed.  This is not, you know, sort of, a, well, this might

3    happen; this is going to happen if he does not have surgery.

4          Now, I spoke to the prosecutor yesterday about that,

5    who suggested, well, maybe he can have surgery in custody.  He

6    has met with a nurse of some sort at Pierce County Jail who

7    basically told him, Look, that surgery is not going to happen

8    while you're in custody.  If he does not have that surgery, he

9    will become paralyzed.  He already is losing feeling in his

10   hands and in his feet.  He has a burn on his left arm now

11   because he was in the shower, could not tell that it was way

12   too hot, and he burned himself.  He needs to be released to

13   have that surgery.

14         That is, sort of, the overriding concern --

15         THE COURT:  So I know you've indicated that this is an

16   emergent situation.

17         In terms of documentation for that, what are

18   you -- what are you directing me to?

19         MR. KIRBY:  The medical records that I have provided,

20   Your Honor.

21         THE COURT:  Okay.  So I'm looking at those.  And I see

22   some -- some notes about the reasons for the visit, and the

23   diagnosis being cervical radiculitis.  But I'm not, I guess,

24   seeing a reference to "he will be paralyzed unless he has

25   surgery immediately" or anything in the kind of dire category

1    as you have described it.  And I'm not challenging your proffer

2    necessarily.  I'm just looking for support for it in the

3    records themselves.

4        MR. KIRBY:  And what the records do say is that he has

5    spinal stenosis.  That's what it says in there.  And you're

6    right, Your Honor, it does not say in there that, yes, if he

7    doesn't have immediate surgery, he is going to become

8    paralyzed.  I'm just passing along what has been told to him by

9    two different doctors.

10        They had said initially within five years, when he

11   was -- when he was more recently seen by a doctor at University

12   of Southern California in San Diego, they told him, Look it,

13   you need this surgery now.  You -- you sneeze wrong, you are

14   jostled wrong, you could become paralyzed immediately.

15        And, Your Honor, quite frankly, if there was any -- if

16   I thought there was a decent chance that he would have

17   corrective surgery while in custody, this would be a whole

18   different case.  But it's not.  And -- and I have been

19   practicing in various different jurisdictions since 1995, and

20   to have some sort of complex surgery like this, is extremely

21   unlikely.

22        THE COURT:  Did Mr. Douglas have any concrete plans to

23   have this surgery within the last five years since he learned

24   of his diagnosis?

25        MR. KIRBY:  He had not had concrete plans because it

1    was sort of a five-year off period.  It was not --

2         THE COURT:  Just a little curious, that all of a sudden

3    it becomes an emergency when he is looking at detention in a

4    very, very serious child pornography case; when he is looking

5    at seven counts of distribution, each carrying 15 years, and a

6    guideline range estimated at 210 months.

7         MR. KIRBY:  I understand that, Your Honor.  And I -- I

8    agree with you.

9         But, honestly, Your Honor, if I didn't have a good

10   faith belief in what I'm saying, I would not say it.

11        THE COURT:  No, no, no, and I'm not trying to insinuate

12   that there is not a good faith diagnosis in place.  It's just

13   curious as far as, you know, the timing for the emergency as

14   it's been characterized.

15        What is your response to the discrepancy as it's been

16   called between the statement and the sworn affidavit that he

17   hasn't used illicit substances since 2011 and the statement to

18   probation that he used, I think, it was cocaine around the time

19   that the report was prepared, which would have been -- let me

20   see here.

21        Officer Spille, do you know when the pretrial services

22   report was prepared?  Oh, December 13th; is that correct?

23        THE PROBATION OFFICER:  Yes, Your Honor.

24        THE COURT:  All right.

25        MR. KIRBY:  My understanding -- oh, I'm sorry.  Go

1   ahead.

2          THE COURT:  No.  I was curious if you had a response to

3   that.

4          MR. KIRBY:  My understanding, in speaking to my client,

5   is that he -- he has been working with the homeless people

6   probably in a way that he was -- was not well thought out, but

7   he had been trying to help homeless people in his neighborhood.

8   And he had purchased illicit drugs for their use; he had not

9   used drugs himself.  He has not used drugs himself since the

10  early 2000s.

11         THE COURT:  So you're maintaining that he didn't

12  himself use illicit drugs since 2011?

13         MR. KIRBY:  That is correct, Your Honor.  And -- and if

14  Your Honor wants him to test however often Your Honor wants him

15  to test, he certainly is willing to do that as a condition of

16  his release.

17         THE COURT:  Well, I'm just not sure what to make of the

18  fact that the pretrial services report says, quote, "The

19  defendant stated he has also experimented with cocaine and last

20  used days ago, but rarely uses cocaine."

21         MR. KIRBY:  There is a miscommunication there,

22  Your Honor, that I can't explain beyond what I have already

23  said.

24         THE COURT:  Okay.  Now, can you educate me a little bit

25  on this trust bond and how it operates?

1          MR. KIRBY:  Yes, Your Honor.  I -- they do the -- those

2     regularly in the Southern District.  And, essentially, what

3     happens is a trust is put onto a piece of property, and so the

4     United States becomes the lienholder.  And so if -- if the

5     defendant were to disobey a condition of bond, then that -- the

6     government would have the ability to go ahead and forfeit that

7     property immediately.  So there is no question of additional

8     litigation.  It's forfeited to the government.  That -- that's

9     my understanding.

10          I mean, honestly, Your Honor, I usually have an

11     investigator who puts those things together, but I --

12          THE COURT:  That's at least an effective enough

13     explanation.

14          All right.  So as far as the bond that was put in place

15     by the magistrate in California, that's $100,000 personal

16     surety bond secured by that trust deed.  And who are the

17     cosigners?

18          MR. KIRBY:  That would be his mother, Your Honor.

19     Actually, I take that back.  Apologies.  That would be his aunt

20     because the aunt is the person who actually owns the property.

21     I think his mother would probably also be a signer as well, but

22     the aunt did -- it would be the aunt's property that would take

23     the lien.

24          THE COURT:  And that's where Mr. Douglas was living

25     during the alleged offenses; correct?

1           MR. KIRBY:  And that's where he would live during the

2    pendency of this case.

3           THE COURT:  What is your response to the -- to the

4    suggestion that just -- the ties to the district inquiry are

5    principally focused on this district?  In looking at his ties

6    to this district, there really don't appear to be any.

7           MR. KIRBY:  Well, Your Honor, he does have some

8    relatives in this -- in the Florida area, but they're -- I'm

9    not going to say they're strong ties.  I mean, he has some

10   cousins who live in this area.  But the ties I believe that are

11   the most important ties are where he would be staying, and

12   where he would be staying is San Diego.  And the real question

13   is:  Is he going to flee?  Is he going to flee that

14   jurisdiction?

15          THE COURT:  But it's really:  Is he going to show up at

16   all the hearings?

17          MR. KIRBY:  Sure.

18          THE COURT:  Which is, I guess, another way of saying

19   what you just said.

20          But what can you offer the Court in terms of any degree

21   of assurance that him in California, living in that same

22   residence, no ties to this district, is going to show up

23   regularly for court hearings?

24          MR. KIRBY:  Well, I would note that he waived identity.

25   He waived a hearing in the Southern District of California to

1   voluntarily be brought here.  And if he does not, Your Honor

2   certainly has the ability, through the marshals, to --

3   you know, if he doesn't show up or if he doesn't obey, any of

4   the conditions, Your Honor has the ability to practically

5   instantaneously put him into custody.

6           THE COURT:  Okay.  So we talked a lot about the ties

7   and the flight issues, but -- so let's shift gears just on the

8   danger component.

9           Given the weight of the evidence and the nature of the

10  allegation, I would like to hear a little bit from your end on

11  that aspect, which did motivate, I think, strongly the initial

12  order, and it wasn't really addressed in the reconsideration.

13          MR. KIRBY:  Yes, Your Honor.  And certainly

14  that -- when you look at the complaint, when you look at the

15  indictment, if you just look at those at face value, you do see

16  an issue there.  But I think the question is:  Are there any

17  conditions that you can fashion that will ameliorate that

18  issue?

19          And I think you can.  You can have him on house arrest.

20  You can have him with an ankle monitor.  You can bar any

21  computers of any nature from being in that household and his

22  ability to -- to access them.  So I think Your Honor can

23  fashion an order that will address those issues and make it so

24  that, you know, even looking -- looking at those allegations on

25  their face, he would not be able to replicate any of that sort

1    of activity.

2         THE COURT:  All right.  I'm just wondering if there are

3    any additional areas that need to be addressed.  Anything

4    further you believe I should consider in making this decision,

5    Mr. Kirby?

6         MR. KIRBY:  Your Honor, the only other thing I would

7    say, and I hate to sort of cut against myself.  But if for

8    whatever reason Your Honor does not consider bond in this case,

9    I would ask that he -- that the Court -- I want to say

10   order -- but strongly suggest that he see a doctor immediately,

11   because he was told that, perhaps, in two weeks he may see a

12   doctor, and he needs to see a doctor now.  And this -- this

13   physical situation needs to be addressed now.

14        THE COURT:  And the particular type of specialist or

15   physician that he needs to see is what?

16        MR. KIRBY:  I'm trying to think.  I had back surgery

17   myself.

18        THE COURT:  Orthopedic surgeon maybe?

19        MR. KIRBY:  An orthopedic surgeon, I believe, yes.  Or

20   a neurologist, Your Honor.

21        THE COURT:  Okay.

22        All right.  I don't have any additional questions at

23   this time.  Let me see if Mr. Schiller has anything else to

24   offer.

25        MR. KIRBY:  Thank you, Your Honor.

1          MR. SCHILLER:  Judge, if I may, I just wanted to add

2     one point.  And that is, in the magistrate judge's second

3     hearing on this matter, on page 7 of the transcript, when it

4     was suggested that one of the conditions the Court could impose

5     be a GPS monitor, the judge says:  "I don't use GPSs anymore,

6     after the last two individuals last week cut them off, so I no

7     longer order GPS.  Either detained or bond.  I don't use GPS as

8     a condition.  It's just not worth it, quite frankly."

9          So it doesn't sound like there was any middle ground

10    for the judge.  And it still is hard-pressed for the government

11    to believe that those points that were brought up by defense

12    counsel at the second bond hearing somehow overcame not just

13    the presumption, but the standards for detention under theories

14    of flight and danger to the community.  So I would suggest to

15    the Court that the only appropriate bond in this case is

16    pretrial detention.

17         I also just wanted to point to the Court that in my

18    appeal, I did mention one particular case in which a defendant,

19    very similarly situated to this defendant, almost to a T, went

20    through the exact same scenario.  Bond was granted, the

21    appellate court, being the district court, overturned that

22    order almost identically.

23         And this Court has seen other decisions that Your Honor

24    has handled and other judges in the Southern District of

25    Florida, the same way under similar circumstances and

1  individuals not in such heightened levels of criminal activity.

2  Thank you.

3       THE COURT:  Okay.  All right.  Well, having considered

4  the matter and admitted just the limited additional exhibits

5  filed by defendant, which consist of medical records reflecting

6  that diagnosis and, again, having reviewed the full record and

7  conducted an independent review, I do believe that the

8  government's appeal is well taken, and that there are no

9  conditions that can reasonably assure the community on the

10  subject of danger, using a clear and convincing standard, as

11  well as risk of flight under a preponderance standard.

12       This is a case involving a presumption, and the facts

13  as set forth by the magistrate judge in its initial detention

14  order, I think remain just as relevant and valid.  And the

15  additional information that was raised in the motion for bond,

16  afterward, is really no basis to reconsider the initial

17  detention order.

18       And even if it did qualify as new evidence, it still

19  would not tip the scales or simply an intolerable risk in this

20  case of both danger and risk of flight.  So for those reasons,

21  I will be granting the government's appeal.

22       I do want to say in this case that it really wasn't a

23  close call, having looked at all of the factors.  That said,

24  the health issue is something that needs to be monitored, and

25  so I will do what I can through BOP channels to inform them of

1    a need for a consult.

2         And if there becomes a concrete issue to address, then,

3    Mr. Kirby, you are welcome to file a motion with the Court with

4    any additional information.  But I will do what I can to advise

5    BOP of the need for a consultation, as I do think that is

6    warranted.

7         Other than that, I think the appeal issue is warranted.

8    As I said, I will be entering a written order to that effect.

9         Ms. Cassisi, there was a scheduling order entered in

10   this case; is that correct?

11        COURTROOM DEPUTY:  Yes, Your Honor.

12        THE COURT:  And trial is set for when?

13        COURTROOM DEPUTY:  One moment, Your Honor.

14        MR. HOWES:  Judge, it's the second week of April, I

15   believe.  I'm sorry, Madam Clerk.

16        THE COURT:  Thank you.  Okay.  All right.  Well,

17   then --

18        COURTROOM DEPUTY:  April 22nd, Your Honor.

19        THE COURT:  April 22nd.

20        What is the status of discovery, Mr. Schiller, and

21   where are we, kind of, in the pretrial phase of this case?

22        MR. SCHILLER:  Certainly, Judge.

23        We just had the arraignment, I believe, on Thursday of

24   last week.  So the discovery order was just entered.  I plan on

25   having discovery to the defense, hopefully, by either the end

1    of this week but most likely early next.  There's a great deal

2    of it.

3          And, unfortunately, because so much of the material

4    involves child exploitation images and videos, we won't be able

5    to give those to the defense.  Mr. Kirby or Mr. Howes will have

6    to come in to view that.  I have preliminarily spoken with

7    counsel about that.

8          And so we -- if, you know, the sides feel that more

9    time is necessary, we will address that with the appropriate

10   motions to the Court.

11         THE COURT:  Okay.  All right.  Any other issues to

12   raise at this time in terms of scheduling or discovery?

13         MR. HOWES:  Judge, I'm going to be the one that is

14   stuck looking at the videos.  I have plans to be out of the

15   district next week on some -- a wedding, actually, I'm going to

16   next week, and my wife has a trial the following Monday after

17   that in Tampa.

18         So it's going to be a couple of extra weeks that we get

19   to the point where I think the government can have me come up.

20   I live in Fort Lauderdale.  That's not the issue.  But I'm just

21   saying the time that we can both get together.  So I would like

22   for you to keep in mind that when we come back to you, because

23   I'm sure that we will, with respect to a trial date on this and

24   motion practice on this.

25         THE COURT:  Okay.

1          MR. HOWES:  We will keep you informed, and I will make

2     sure in the 21 order -- or 21-day notice, we will address that,

3     and I will have addressed that before then in a manner in which

4     we can -- you will not be confined on the 90-day, on speedy

5     trial.

6          THE COURT:  Okay.  You read my mind.  Yes, make sure to

7     address any waiver issues in any motion for a continuance, and

8     also be mindful of the date for pretrial motions if you are

9     seeking a continuance of that deadline as well.

10         MR. HOWES:  Yes, ma'am.

11         THE COURT:  All right.

12         Mr. Douglas, I wish you well.  I will see you at the

13    next court hearing.

14         That is all for now.  The government's appeal is

15    granted and a written order will follow this hearing.

16         MR. KIRBY:  Your Honor, just two small matters since

17    Mr. Douglas will remain in custody.  He did have a neck brace

18    at one point, and it was taken from him.  He also had an

19    emergency asthma inhaler that was taken from him.  If those

20    items can be returned, the brace doesn't stop the progression

21    of the disease, but it does make him more comfortable.

22         THE COURT:  Okay.  Thank you.  I will make a note of

23    that.

24         MR. KIRBY:  Thank you.

25         THE COURT:  That is all.  Have a nice rest of your day.

```
 1              (These proceedings concluded at 2:22 p.m.)

 2                         C E R T I F I C A T E

 3

 4

 5

 6    I hereby certify that the foregoing is an accurate

 7    transcription of the proceedings in the above-entitled matter.

 8

 9
      DATE:  05-20-2024        /s/Laura Melton
10                             LAURA E. MELTON, RMR, CRR, FPR
                               Official Court Reporter
11                             United States District Court
                               Southern District of Florida
12                             Fort Pierce, Florida

13

14

15

16

17

18

19

20

21

22

23

24

25
```