## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 23-80219-CR-CANNON

UNITED STATES OF AMERICA

v.

MICHAEL GORDON DOUGLAS

_____/

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED FROM WARRANTLESS SEARCH OF VEHICLE DOUGLAS WAS DRIVING WHEN ARRESTED (DE 46, 54)

The United States, by and through the undersigned Assistant United States Attorney, hereby files this response to Michael Gordon Douglas' ("Defendant" or "Douglas") Motion to Suppress Evidence Seized from Warrantless Search of Vehicle Douglas was Driving (DE 46, 54).

On December 12, 2024, the defendant was arrested in the Southern District of California on a criminal complaint and arrest warrant issued in the Southern District of Florida on December 5, 2024 (DE 1). On December 19, 2024, the Government charged the Defendant in a seven-count Indictment (DE 7). On July 18, 2024, the government obtained a Superseding Indictment which added one count (DE 55). As it currently stands, Counts 1 through 7 charge the Defendant with distribution of child pornography, in violation of Title 18, United States Code, Section 2252A(a)(2) and (b)(1).  Count 8 charges the Defendant with attempted enticement of a minor, in violation of Title 18, United States Code, Section 2422(b).

In his motion, filed on July 5, 2024 (46) and refiled on July 16, 2024 (DE 54) the Defendant seeks to suppress evidence that law enforcement obtained from a search of his vehicle he was arrested in. In support of his motion, the Defendant makes, in effect, two separate arguments. Specifically, the Defendant offers that the search was conducted without probable cause and

without the consent of lawful owner of the vehicle: the Defendant's Aunt Patricia Douglas[1]. The vehicle in question is a Toyota Highlander that the Defendant was driving at the time of his arrest. The Court should reject these arguments and deny the motion.

With respect to the first argument, and a lack of probable cause, Homeland Security Investigations (HSI) had probable cause to stop the Highlander driven by the Defendant and search it for four reasons: HSI had an arrest warrant for Douglas; HSI believed Douglas to be driving to a predetermined meeting location where he was to have sex with a an 8-year-old child and evidence of the same existed in the vehicle; he took evasive measures to escape the pursuit by law enforcement through the streets of Escondido, California; and he had brandished what appeared to be a real grenade to law enforcement, upon being stopped.

With respect to the second argument, at roughly 9:00 P.M., HSI agents executed a search warrant at Douglas' residence approximately four and one-half miles south of Douglas' arrest. While on scene HSI agents encountered the Defendant's mother, Linda Douglas, and Aunt, Patricia Douglas. During the interview, Patricia Douglas signed a consent to search the Highlander, which was subsequently provided to the agents on the scene of the Highlander.

In addition, the motion to suppress should be denied because there was an emergency exception to the warrant requirement caused by the Defendant's use of what appeared as a real grenade.

## I. FACTS

The detailed facts of this case through and including November 27, 2023 are contained within the criminal complaint (DE 1) (23-mj-8589-RMM). The sum and substance of those

---

[1] The defendant also argues that the government did not have a search warrant for the Highlander. The government concedes this point, as no search warrant for the vehicle existed, nor was one needed based upon the facts outlined herein.

conversations are that the defendant solicited what he believed to be the 8-year-old daughter of a 28-year-old woman for sex, whom he met online in a chat room. In fact, the 28-year-old woman was an undercover HSI agent (UCA) and the child was notional. Over the course of two months, he distributed child pornography to the UCA on multiple occasions, described the sexual exploits he wished to commit on the child, and sent live images and videos of himself while using the application to commit these acts

However, between November 27, 2023 and December 4, 2023 (when the complaint was signed for the defendant's arrest for seven (7) counts of distribution of child pornography), and through his physical arrest on December 12, 2023 in the Southern District of California, additional evidence was gathered and is detailed below.

In the online communications with the UC, Douglas desired to meet with the notional child to engage in sex with her, describing in horrific, graphic detail, how he wished to rape the child. In early December he offered to fly to Florida, asserting he had been to South Florida in the past, but later indicated that he would not be able to travel to Florida due to a lack of money. After the UCA offered that she and the notional child would be visiting family in Phoenix, AZ in mid-December, Douglas asked if she could bring the child to California. The plan was devised to meet somewhere around the Carlsbad, California, area near the Legoland theme park. This is approximately 15 miles from Escondido, California, where Douglas lived.

On December 4, 2023 Douglas texted the UCA that his phone cracked and he just got a new one. Upon his arrest, a cracked Verizon phone was found on the driver's side floorboard where Douglas had been sitting. A second, Verizon phone, was found in Douglas' residence. Both phones contained evidence of his online communications with the UCA and his possession of child pornography. As Douglas planned the sexual rendezvous with the 8-year-old child, he offered that an Air BnB would be best "in case things get loud moans or she cries a little bit. No matter how

gentle I am when I pop her cherry she most likely will cry s bit." Douglas sent three links to different Air BnBs in San Marcos and Carlsbad, California. The UCA confirmed she and the child would be in Arizona on December 12, 2023. Douglas offered that he would be able to take off from work between December 12 and 14, 2023.

On December 10, DOUGLAS texted the UCA that, "My phone is all messed up but this is red and I think [Child1] would look sexy in it" along with a photo which showed a two-piece red lingerie set that was laid out on what appeared to be a brown couch and a set of white or clear anal beads laying on top of the lingerie set. About 10 minutes later, Douglas sent the UCA a 33-second-long video of himself, nude and masturbating over a two-piece black lingerie set that was laid out on what appeared to be the same brown couch in the photo that the UCA just received. This couch was later observed in Douglas' residence. In the video, Douglas stated "Mmm. [Child1] is gonna love my cock inside her. [inaudible] this cute little outfit on and wear it for me. And then I'm gonna fuck her in it. You're gonna be so wet aren't you [UC's First Name]? Mhm. You're gonna want Daddy to fuck her won't you? Making me cum inside her, in a few short days."

That same afternoon, the UCA identified several gifts for Douglas to bring the notional child, in an effort to identify the defendant if they met and confirm his intent. When the UCA mentioned a stuffed animal, Douglas replied, "Already done", and added that he bought the child a stuffed unicorn. In regards to the black lingerie set in the video that he sent, Douglas told the UCA that it may be too big for the child for a few months, "but she'll grow into her with all the cum I fill her with." Douglas later added that he would be "bringing a speculum too to help keep her open" (a reference to the child's vagina during intercourse).

That afternoon and again the next day, Douglas messaged how he would have sex with the child and that he would have the UCA use a "double headed dildo" on the child as well. The next day, Douglas inquired if the UCA had in fact arrived in Arizona with the child.

On December 12, 2023, the day of the arrest, Douglas messaged that he had a mini bullet vibrator and described how he was going to use a double headed dildo on the child. Then, when the UCA reminded Douglas not to forget to bring the red lingerie and the stuffed unicorn, Douglas stated that he would not forget.

Around 1pm, the UCA texted the address of the hotel in Carlsbad, CA where she and the notional child were staying and expecting Douglas, along with a photo of the lobby. As the day went on, Douglas appeared to be delaying or stalling as to when he would arrive at the hotel, explaining he had errands to run, had to chauffer his mother around, and drop her off. As the day wore on, UCA repeatedly asked Douglas if he was for real, to which Douglas responded he was and would be coming to the hotel. As night fell, Douglas and the UCA spoke on the phone. He therein explained all the matters he was attending to and why he was running late. Upon the UC reminding Douglas not to forget the child's gifts, he stated that he had it in the trunk of his car. At about 6pm, when the UC said she would give the child sugar to stay awake, Douglas messaged, "She'll taste sweet too."

By 6:30 P.M., Douglas had advised the UC he was going to shower and head to the hotel. 7:00 P.M. was the last communication before Douglas was encountered by police.

Surveillance on Douglas that day confirmed him making many stops and driving around a female. At approximately 7:20 P.M., surveillance units observed DOUGLAS leave his home in the Toyota Highlander. Douglas drove to several different hotels. At each hotel, he arrived and departed within a few minutes. After the third or fourth hotel, Douglas increased his speed of travel and was somewhat erratic in his driving patterns. At approximately 7:45 P.M., Douglas drove the highlander at the corner of W El Norte Pkwy and Seven Oakes Rd. Agents noticed that amber emergency lights were flashing from the windshield of the Highlander. As he drove, he passed through intersections against traffic signals and traveled over the speed limit.

Due to Douglas' unusual activity, HSI decided to arrest Douglas as soon as practicable. As HSI considered Douglas dangerous, given his prior criminal history, and the fact that there were two elderly women living in the residence, they did not want Douglas to re-enter the home and create a barricade or hostage situation.

Agents observed Douglas entering the I-15 freeway northbound from El Norte Parkway with the emergency lights engaged, and exit the freeway at Deer Springs Road. Douglas turned east, then north at City Centre Parkway, and then left into a "park and ride" lot immediately east of I-15. As multiple HSI vehicles converged on Douglas' location, they activated their emergency lights, and pinned the Highlander from the front and back.

Douglas was ordered not to move and a flash bang was detonated. Immediately thereafter, the front-seat passenger, named Crystal, fell out of the vehicle and began frantically screaming things such as, "he is going to kill us," "he is crazy," and "grenade"[2]. A second flash bang was detonated on the hood of the Highlander, resulting in Douglas ducking down behind the dash of the vehicle. When he sat up, he presented one open palm to the windshield and a closed fist in a menacing manner. Douglas began shouting with his door closed and window shut. Agents observed what appeared to be a green, baseball-sized, hand grenade in Douglas' hand. Agents took evasive positions to shoot Douglas if it appeared he would drop the grenade; but held off shooting him in case he had already pulled the firing pin.

Crystal was removed from the ground outside the Highlander. She told agents that Douglas threatened to blow the two of them up, as well as throw "it" at law enforcement as they were following the Highlander. Civilians and other non-law enforcement vehicles were within the immediate area of the incident. The agents were then able to observe what appeared to be a M67

---

[2] It was unknown that Douglas had a grenade at that moment or if Crystal was referring to the flash bang that had been detonated.

fragmentation hand grenade. The agents knew the weapon's kill radius of an uncontained blast to be approximately 16 feet and the injury radius is approximately 49 feet or more.

When all persons had cleared the potential blast zone, HSI directed Douglas to put the grenade down. After approximately one to two minutes of negotiations and commands between HSI and Douglas, Douglas placed the hand grenade on the dashboard of his vehicle. Douglas then complied with directions of law enforcement to eventually exit the vehicle. Douglas was ordered to slowly remove his jacket for fear of additional explosive devices on his person. DOUGLAS was taken into custody. When handcuffed he made comments such as, "What is this for? Why is this happening? This is illegal. I'm going to sue all of you." Douglas also stated somebody set him up.

Search of Douglas, incident to arrest, agents found the following on his person: multiple knives, an anal plug sex toy, and a wallet that contained his California identification card, a CashApp debit card for username $ChicagoMikeMGD, as well as other identification. DOUGLAS did not have a cellular phone on his person. A bomb technician was brought in to examine the grenade as it sat in the car, which turned out to be fake. The bomb technician with probable cause to believe other replica hand grenades could be in the vehicle, and with the exigency that others could be harmed by explosives in the vehicle, searched the vehicle and surrounding area for explosive hazards. The bomb technician found no explosive hazards in the vehicle or in a backpack on the ground near the front passenger door.

With Douglas now in custody, agents executed the federally obtained search warrant at his residence at approximately 9:00 P.M. Douglas' mother Linda and Aunt Patricia were in the residence. They were both interviewed by HSI agents. During the interview, Patricia Douglas was asked if she would grant consent for agents to search her Toyota Highlander (the one Douglas was arrested in) as she is the registered owner of the vehicle. Patricia Douglas granted consent for agents to search her vehicle and signed a consent to search form (See Exhibit 1).

Upon receiving the signed consent, agents on scene of Douglas' arrest, along with the probable cause, search incident to arrest, and exigency of the explosive devices and weapons found on Douglas, searched the vehicle. Upon doing so, they found a black Verizon cell phone with a cracked screen on the driver floorboard of the vehicle. In the trunk of the vehicle, HSI located a green bag that contained a unicorn stuffed animal, red lingerie, a two-piece black lingerie, one-piece black lingerie, a vaginal speculum/dilator (unopened, still in package), a strap-on dildo sex toy, a double-headed dildo sex toy (unopened, still in package), astroglide lubricant (unopened, still in package), a pink mini bullet vibrator, and an anal beads sex toy.

The Verizon phone (along with the digital items found inside the Defendant's home) were shipped to the Southern District of Florida. They arrived on December 15, 2023, wherein search warrants to search the items were obtained on December 20, 2023 (23mj8609WM and 23mj8610WM) and executed shortly thereafter.

## II. ANALYSIS

The Defendant advances two arguments to suppress the items seized from the Highlander at the time of his arrest.  The Court should reject these arguments for the reasons stated below.

### A.  Law Enforcement Had *Probable Cause* to Search the Toyota Highlander

The defendant argues that law enforcement did not have probable cause to search the Toyota Highlander. Importantly, he does not assert that law enforcement did not have probable cause to stop him. And rightfully so, as there were numerous reasons to support the probable cause stop of the defendant: there was a warrant for his arrest; he committed a multiple traffic violations in the presence of law enforcement; there was probable cause that he was in possession of contraband, to wit, child pornography.  *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008).

Moreover, the defendant neglects to assert that law enforcement did not have probable cause to arrest the defendant. "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *United States v. Lopez-Garcia*, 565 F.3d 1306, 1314 (11th Cir. 2009). Here, the police had probable cause to arrest the Defendant for, at the very least the arrest warrant that was in place, where a federal magistrate in the Southern District of Florida determined there was probable cause.

With no challenge to the traffic stop, and no challenge the arrest, the defendant maintains that law enforcement could not search the vehicle as they did not have probable cause (DE 46:1). His argument fails because law enforcement was entitled to search the car: 1) incident to arrest; 2) pursuant to the automobile exception to the warrant requirement; 3) as exigent circumstances existed; and 4) as an instrumentality of the crime charged.

1. Search authorized incident to arrest

It is well established that when a law enforcement officer has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile, including the contents of containers therein. *New York v Belton*, 453 U.S. 454, 460-61 (1981). A search incident to a lawful arrest requires no additional justification. *Belton, supra.* Douglas, the driver of the car, was arrested based upon probable cause as determined by a Federal Magistrate prior to the search of the car. Because Douglas' arrest was proper, the search of her car was proper as a search incident to an arrest.

The purpose for a search incident to arrest is to find weapons that the suspect may use to injure police officers and to prevent the concealment or destruction of evidence of the crime. *Michigan v. Long,* 463 U.S. 1032 (1983). This purpose defines the permissible scope of an automobile search incident to an arrest. *Florida v. Jimeno*, 500 U.S. 248(1991); *United States v.*

*Diaz-Lizaraza*, 981 F.2d 1216 (11th Cir 1993). A search incident to arrest and of the car are constitutional here because officers may search an individual upon arrest and may search a car when there is probable cause that it contains contraband. *See United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007); *Arizona v. Gant*, 556 U.S. 332, 339, 129 S. Ct. 1710, 1716, 173 L.Ed.2d 485 (2009) (explaining that officers may conduct a search incident to arrest on the "arrestee's person and the area within his immediate control" to prevent the destruction of evidence and to avoid potential harm to the arresting officer (internal citation and quotation marks omitted)).

Since Douglas could have secreted evidence in any part of the car, the search of the entire car was permissible. Likewise, the search of the trunk was also valid because he had been communicating via phone with the UCA prior to his arrest and advised the items for the child would be in the car (including the trunk). When Douglas was arrested and save one sex-toy was found on him, it was reasonable to believe the remaining evidence would be in the car or in the trunk.

When a law enforcement officer makes a lawful arrest of an automobile's occupant, the officer is constitutionally permitted to search the vehicle's passenger compartment as a contemporaneous incident of arrest, even when the search does not happen until the person arrested has already left the vehicle. *Thornton v. United States*, 541 U.S. 615, 124 S. Ct. 2127, 158 L. Ed. 2d 905 (2004) (so long as an arrestee is the sort of "recent occupant" of a vehicle such as petitioner was here, officers may search that vehicle incident to the arrest").

2.   Search pursuant to the automobile exception to the warrant requirement

Under the so-called "automobile exception" to the warrant requirement, the police "may conduct a warrantless search of a vehicle if (1) the vehicle is readily mobile (i.e., operational); and (2) agents have probable cause to believe the vehicle contains contraband or evidence of a crime."

*United States v. Tamari*, 454 F.3d 1259, 1261 (11th Cir. 2006); *accord Chambers v. Maroney*, 399 U.S. 42, 48-49 (1970). "[P]olice officers with probable cause to search a car may inspect passengers' belongings found in the car that are capable of concealing the object of the search." *Wyoming v. Houghton*, 526 U.S. 295, 307 (1999); *accord United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."); *United States v. Strickland*, 902 F.2d 937, 942 (11th Cir. 1990); see also California v. Acevedo, 500 U.S. 565 (1991). Because probable cause existed to search the vehicle for evidence of phones and items Douglas would bring to the sexual encounter with the 8-year-old, officers were allowed to search the areas where they found exactly those items—the floor and the connected trunk. *United States v. Alston*, 598 F. App'x 730, 734 (11th Cir. 2015)

"Probable cause … exists when under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." *Tamari*, 454 F.3d at 1264 (quotation marks omitted). "A reviewing court [assessing probable cause] may examine the collective knowledge of law officers if they maintained at least a minimal level of communication during their investigation." *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985). In assessing probable cause, the facts should be weighed "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Moreover, a warrantless search of a car pursuant to the automobile exception need not be based on any exigency other than the mobility of the vehicle. *See Michigan v. Thomas*, 458 U.S. 259, 261 (1982) ("[T]he justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in any particular case that the car would have been driven away, or

that its contents would have been tampered with, during the period required for the police to obtain a warrant."); *accord United States v. Forker*, 928 F.2d 365, 369 (11th Cir. 1991); *United States v. Nixon*, 918 F.2d 895, 903 (11th Cir. 1990) (for purposes of automobile exception to warrant requirement, "the requirement of exigent circumstances is satisfied by the 'ready mobility' inherent in all automobiles that reasonably appear capable of functioning").

Indeed, the Eleventh Circuit has held that probable cause for the warrantless search of a car existed in circumstances comparable to – and even much more favorable to the defendant than – those at issue here. *See, e.g., United States v. Alexander*, 835 F.3d 1406, 1409 (11th Cir. 1988) (probable cause to search car for evidence of defendant's commission of bank robbery, even though bank robber fled the scene of the robbery on foot and police had no specific evidence tying the car to the commission of the robbery, where there was abundant probable cause that the defendant had committed the robbery, the defendant had been driving the car on days after and other than the day of the robbery, and the police were simply hoping to find additional evidence of the crime that had not yet been found)[3]; *United States v. Brazel*, 102 F.3d 1120, 1146-47 (11th Cir. 1997) (holding there was probable cause to search car owned by aunt of a co-defendant for evidence of drug offenses even though police had never observed drugs or a gun in the car and had no specific evidence that the car was ever used to transport drugs, where there was evidence that the defendant was involved in drug offenses, one officer had seen defendant driving that car on a single occasion earlier that month, an officer saw razor blades through the window of the car, there was reason to believe that the defendant was the real or main user of the car since the nominal owner of the car did not have sufficient money to buy it, and the car had previously been spotted – though not

---

[3] *Alexander* cannot be distinguished on the ground that the defendant stated there was something in the car he did not want the police to see, as that was "not a factor in [the Court's] decision," which held that "[p]robable cause to search the car existed before [the police] ever asked Alexander to consent to a search of the vehicle." 835 F.2d at 1409 n.3.

implicated in criminal activity – at a particular surveillance site); *United States v. Gaudin*, 492 F.2d 132, 132-33 (5th Cir. 1974) (upholding search of car, including trunk and glove compartment, after defendant was "taken into custody [for] passing counterfeit bills at a shopping center," where the defendant "had just been apprehended passing counterfeit money, the keys found on his person connected him with the car, currency that was not obviously counterfeit and that in fact turned out not to be counterfeit was in plain view inside the car, and his wife was at large" and thus capable of moving the car and/or concealing evidence it might have contained).

Here, despite being pinned by law enforcement, the car was completely operational. In fact the car was returned to Aunt Patricia. Second, as has been explained in detail, the agents had probable cause to believe the vehicle contained a phone and the items Douglas would bring to the sexual encounter with the 8-year-old. Both were contraband or evidence of a crime.

### 3. Search Authorized As There Were Exigent Circumstances

The exigent circumstances to search the Highlander are exhaustive. It goes without saying, but the Defendant came within seconds of loosing his life. He held what appeared to be a grenade in the face of law enforcement ordering him to exit the car; refused to exit the car; and began yelling at the officers. Had he put his hands together (in a motion that could have indicated the pulling of the grenade's firing pin), he likely would have been killed by law enforcement snipers. A bomb technician was called in to make the grenade safe (only to find out it was fake). Incident to arrest law enforcement found knives on the Defendant. The exigent search of the vehicle did not reveal any other weapons, but did in fact reveal the defendant's phone and a bag containing the times he was to bring to his sexual encounter with an 8-year-old girl.

And despite all of these facts, the Eleventh Circuit has held that it takes much less to create exigency. In *United States v. Parrado*, 911 F.2d 1567, 1571 (11 Cir. 1990), the Court rejected the

argument that exigent circumstances to search a defendant's parked vehicle ended with the arrest of the defendants outside that parked vehicle. The Court stated:

> It is thus clear that the justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.

*Id*., *quoting Michigan v. Thomas*, 458 U.S. at 261. *See also, United States v. Birdsong*, 982 F.2d 481, 482-83 (11th Cir. 1993) (rejecting arrested defendants' claim no exigent circumstances existed to search his parked car); *Forker*, 928 F.2d at 368-69 (finding exigency sufficient to search a defendant's parked car in a motel parking lot); *United States v. Hall*, 716 F.2d 826, 830 (11th Cir. 1983). At the time Douglas' car was searched, police knew the car was operational because not only was it parked on the street, but Douglas had just driven in. Accordingly, the defendant's argument that the police were required to obtain a warrant is contradicted by over thirty years of precedent as they had an exigent situation.

But the fact that he had just driven the car or caused law enforcement to be in "hot pursuit," are but two factors the Court need consider to find the search valid based upon exigent circumstances. In fact, in *United States v. Ramos*, 933 F.2d 968, 972 (11th Cir. 1991), the Eleventh Circuit espoused several factors that may indicate exigent circumstances. They include: (1) the gravity of the offense with which the suspect is to be charged; (2) a reasonable belief that the suspect committed the crime; (3) probable cause to believe that the suspect is armed; (4) strong reason to believe that the suspect is on the premises (or vehicle) being entered; and (5) a likelihood that delay could cause the destruction of evidence or jeopardize the safety of the officers. *Id.* at 972. Nearly all of these factors existed when Douglas was arrested in the Highlander.

The defendant may argue that the exigency ended upon the bomb technician clearing the car of any other harmful devices. But the exigency requirement to the automobile exception is

satisfied "[i]f there is a possibility that the contraband will be destroyed or removed, then a warrantless search is justified due to these exigent circumstances." *Forker*, 928 at 369. "The officers or agents must determine if [an] exigency exists at the time of the seizure of the automobile, not at the time of the search of the vehicle." *Id.* at 368-369. Thus the agents could search the vehicle subject to the exigency exception of the search warrant requirement.

4.   <u>The car was an instrumentality of the crime committed</u>

The defendant, in his motion, makes the following argument that is contrary to the facts in this case:

> "Probable cause did not exist because there was no evidence to indicate that DOUGLAS had any items of evidence located in the Highlander when he was arrested. DOUGLAS did not indicate during his communications with the UC that he had any relevant items in his possession while he was driving the Highlander, and he did not make any statements post-arrest to indicate that any relevant evidence would be found in the Highlander."

DE 46:4. The commission of Douglas' crimes did not end at distribution of child pornography. He attempted to entice a minor to engage in sex. In an effort to try to complete this crime, Douglas was eventually driving to a motel where the UCA was waiting for him. In doing so the Highlander transported not only Douglas – the physical body to commit the crime – but also the phone he used, and the sexual devices and toys for the child he planned to use to complete his heinous acts. Douglas told the agent both in online chat and on the phone that he would not only bring these items, but that they were in the car. *See, e.g., United States v. Dickey-Bey*, 393 F.3d 449, 457 (4th Cir. 2004) (holding that the automobile exception to the warrant requirement applied where police "had probable cause to believe that the automobile was an instrumentality of the crime" based on, inter alia, fact that defendant "had arrived [at a pick-up location] in the brown Dodge automobile," and "was going to put [a box containing illegal drugs] in his vehicle" and "was going to get in that vehicle" and use it to transport the illegal drugs from one location to another); *United States v.*

*White*, 488 F.2d 563, 564 (6th Cir. 1973) (holding that "officers had reasonable ground to believe the automobile had been used to transport contraband, if only the two counterfeit notes which were taken from the person of the defendant immediately after his arrest; consequently the officers had probable cause to seize the automobile as the instrumentality of a crime"). In short, there was ample probable cause to search the whole car from the start of the search.

B.   **Law Enforcement Had <u>Consent</u> to Search the Toyota Highlander**

Law enforcement did not ask Douglas for consent to search the Highlander. Knowing the Highlander was owned by Douglas' Aunt Patricia, they asked her for consent during the execution of the search warrant at Douglas' residence. She verbally gave consent. She signed a consent to search form (see Exhibit 1). Thus law enforcement lawfully searched the Highlander with proper consent. "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

1.   <u>Authority to Consent</u>

Douglas does not deny that Aunt Patricia had the authority to consent to the search of the Highlander at issue here. Even if he did, any such claim would fail. "[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 170 (1974); *accord Id*. at 171 ("[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected."). Aunt Patricia told law enforcement, that the Highlander was her car. She certainly had authority to consent to its search. A fortiori, the owner of a car may consent to a search of "all areas" of her own vehicle after

temporarily authorizing a third party to drive it. *United State v. Dunkley*, 911 F.2d 522, 526 (11th Cir. 1990).

### 2. Scope of Consent

Douglas similarly does not deny that Aunt Patricia's authority to consent to the search the entire car. Even if he did, any such claim would fail. The Highlander does not have a separate trunk compartment from the vehicle, but instead, as with most sport utility vehicles (SUVs), is within the cabin of the passenger section of the vehicle. *See United States v. Snow*, 44 F.3d 133, 135 (2d Cir. 1995) ("It is self-evident that a police officer seeking general permission to search a vehicle is looking for evidence of illegal activity. It is just as obvious that such evidence might be hidden in closed containers. If the consent to search is entirely open-ended, a reasonable person would have no cause to believe that the search will be limited in some way."); *See, e.g., Jimeno*, 500 U.S. at 249-50 (1991); *Mendoza-Gonzalez*, 318 F.3d 663, 671 (5th Cir. 2003) (holding that officers did not exceed the scope of a consent for a general search by opening a cardboard box closed shut with a piece of tape; "expectation of privacy with regard to the brown cardboard boxes did not rise to the level of that evidenced by a locked container. Locked containers require specific knowledge of a combination, possession of a key, or a demonstration of significant force to open.").

### 3. Consent *Was* Given by Aunt Patricia

Now, in a surprising argument, the Defendant argues that "at no point did agents secure the consent, written or oral, from Patricia Douglas, Douglas' aunt and registered owner of the Highlander, to search the Highlander" (DE 46:4). To support his argument, the defendant, in a subsequent filing, has offered a notarized statement by Aunt Patricia Douglas in which she asserted on July 13, 2024, under the penalty of perjury that,

> At no time did any member of law enforcement ask my permission to search my Highlander subsequent to Michael Douglas's arrest.

At no time did I give law enforcement permission to search my Highlander.

(DE 54-1:3).

First as noted above, HSI agents encountered Aunt Patricia during the execution of the search warrant at Douglas' residence immediately after his arrest. HSI Special Agents Bonnie Myers and Cesar Valdivia conducted a consensual interview with Aunt Patricia. SA Myers provided a copy of the search warrant and informed Aunt Patricia that she was not under arrest and free to leave the residence. Aunt Patricia desired to stay at the residence and agreed to speak with agents. During her interview, Aunt Patricia orally and in writing signed a consent to search the Highlander, which was subsequently sent to the agents on the scene with the Highlander. They searched the car after it was cleared by the bomb technician and seized the phone on the driver's side floor (see photo 1) and the items in the trunk Douglas was bringing to the 8-year-old (see photo 2).



Photo 1  Photo 2

The defendant now seems to suggest that this never happened. In his July 5, 2024 original motion to suppress filing (DE 46), the defendant does not include Aunt Patricia's affidavit, despite the defendant being arrested nearly six months previously. He provides a footnote that Patricia did

not sign the consent to search and that a filed declaration to that effect would be supplemented, and not attached to the motion (DE 46:2). On July 16, 2024, the defendant refiled the same motion to suppress, this time including the declaration (DE 54-1), which was only dated on July 13, 2024, pointing to the fact that when the initial motion was filed, the declaration had not yet been signed. Several items of interest suggest this declaration should be called into question.

First, the declaration contradicts Aunt Patricia's statement to law enforcement and her own signed consent (Exhibit 1). By her statement she claims, under the penalty of perjury, that the HSI agents were not truthful and that her signature on the consent is not her own. Strangely, her declaration does not deny "signing" the consent to search form. It is unfathomable to consider Aunt Patricia's statement has any veracity.

Second, Aunt Patricia's signature on the consent form (both printed neatly and signed legibly) is completely different from the signature on the declaration. Her signature on the declaration appears different as does the writing of the number "13" for the date. Moreover, the signature on the notary's page (DE 54-1:6) is a different type of signature, which appears slightly closer to the signature from the consent form, but still entirely different.

Upon receiving the declaration, the government was able to obtain a copy of Aunt Patricia's 2021 passport application.[4] The signature on Aunt Patricia's passport application (including her name, photograph, date of birth and social security number) is remarkably similar to Aunt Patricia signature on the consent form, and very different from the alleged declaration and notary page.

The government contends that Aunt Patricia's declaration should give this Court pause in considering its legitimacy and veracity. The overwhelming evidence is that Aunt Patricia

---

[4] On July 17, 2024, the government, only upon preparing this response, received Aunt Patricia's passport application from the United States Department of State on the condition that it not be reproduced without further permission from the department. The government is obtaining that permission and if requested by the Court will produce the same under seal upon the authorization from the department.

knowingly and voluntarily consented to the search of the Highlander on December 12, 2024, giving both oral and written permission, allowing law enforcement to search the Highlander without a search warrant.

### III.  CONCLUSION

For all of the reasons stated above, this Court should deny the Defendant's Motion to Suppress Evidence in its entirety as law enforcement did not need a warrant to search the Highlander. They had probable cause, exceptions to the warrant requirement and consent.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: _/s/Gregory Schiller_
Gregory Schiller
Assistant United States Attorney
Fla Bar No. 0648477
500 S. Australian Ave., Suite 400
West Palm Beach, Florida 33401
E: gregory.schiller@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that I electronically filed the foregoing document and exhibits with the Clerk of the Court using CM/ECF on July 18, 2024.

<u>*/s/Gregory Schiller*</u>
Gregory Schiller
Assistant United States Attorney