UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 23-80219-CR-CANNON

UNITED STATES OF AMERICA

v.

MICHAEL GORDON DOUGLAS
_____/

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTIONS TO SUPPRESS STATEMENTS (DE 47)**

The United States of America submits this response to Defendant's Motion to Suppress Statements (DE 47). The Defendant's motion briefly asserts that he did not properly waive his *Miranda* rights. In fact he did. The motion also argues, in greater length, that at a particular point during his post-*Miranda* interview, the defendant made an unequivocal request for counsel. He did not, and for the reasons below, the motions should be denied.

I.     **PROCEDURAL HISTORY**

On July 18, 2023, a federal Grand Jury returned a superseding indictment charging Michael Gordon Douglas (hereinafter "Defendant" or "Douglas") with seven (7) counts of distribution of child pornography in violation of 18 U.S.C. § 2252A(a)(2) & (b)(1) and one (1) count of attempted enticement of a minor in violation 18 U.S.C. § 2422(b) (DE 55). Douglas' superseding indictment followed a December 4, 2023 arrest warrant predicated on the seven distribution counts (DE 1). He was arrested on December 12, 2023 in the Southern District of California on the day he planned to have sex with an 8-year-old child; a child he believed to be real. In fact, the child was the notional creation of an undercover Homeland Security Special Agent posing as a 28-year-old mom. Subsequent to his arrest, Douglas was questioned by law enforcement. He was thereafter

granted bond in the Southern District of California, which this Court has overturned (DE 25). Trial has been scheduled for September 9, 2024 (DE 20, 27).

## II.   FACTS

As the defendant's motion only challenges alleged constitutional violations caused within his post-arrest, post-*Miranda* interview by law enforcement, which is the only issue defendant challenges in his motion, the government offers the following facts pertaining to that interview.

Following Douglas' arrest, he was escorted to a government vehicle, wherein he was interviewed by HSI SA Aisha Rahman and HSI SA Mark Jay. The car was parked in a parking lot adjacent to the intersection where Douglas was arrested. The interview was audio recorded[1] (*see* Exhibit 1). SA Rahman sat in a front seat of the vehicle. SA Jay sat in the back seat of the vehicle along with Douglas, who was handcuffed. The government concedes this was a custodial interview: Douglas had been arrested, was in handcuffs, and was not free to leave.

Before any questioning began, Douglas apologized for his interactions with law enforcement that occurred immediately before his arrest (1:50). He admitted to having a high school degree, some college, understanding English and would be able to understand his rights (4:25). The agents then read Douglas his rights, including his right to counsel. After all of the rights were read, the agent aske, "Do you understand all of those things?" Douglas responded, "yes mam" (4:50 – 5:20).

As the interview progressed, Douglas rambled on about many things that were and were not responsive to the agents' questions. Repeatedly he interrupted the agents, determined to convince the agents that someone other than himself was using his phone to communicate with the UC and the notional child.

---

[1] As specific points in the interview are mentioned, the time stamps are provided as they appear in the VLC audio/video player program on a computer.

Around thirty-five (35) minutes into the interview, the agents asked Douglas about his statements to Crystal, the woman found in his car at the time of his arrest. The agents challenged Douglas with statements Crystal has already provided them. At approximately 35:55, Douglas seemingly became agitated by what the agents alleged he told Crystal and said, "if this is where the conversation….then lawyer, you're lying, I know you are lying because I was there for this conversation." In response to his statement that the agents were lying, the agents tell Douglas that "that's what [Crystal] said to me." After the agents asserted they have Crystal's statements on tape, they offer that Douglas will hear the statements when he gets a lawyer and it is presented in Court. Douglas continued by arguing with the agents about whether he would in fact go to Court. In a momentary break in Douglas' rant, and in an effort to clarify Douglas' previous use of the word lawyer, at approximately 36:25, the agents told Douglas that it appeared he did not want to speak with the agents. But before they could finish their sentence and clarify whether he actually wanted to stop talking completely, or only about Crystal, Douglas again interrupted the agents and offered what Crystal said or did not say.

At approximately 36:35, the agents interrupted Douglas to again try to clarify he if wanted to speak to them or not, as he previously mentioned the word "lawyer", but Douglas continued to talk, denying he and Crystal were ever going to get to Carlsbad. At approximately 36:56, the agents continued to try to ask Douglas if he in fact wanted to talk without a lawyer, but Douglas only talked about where he was going with Crystal.

At approximately 37:00, the agents attempted to have Douglas explain what he meant by "lawyer" earlier and again asked him if he wanted to continue to talk to them or not; all the while Douglas interrupting the agents to talk about what Crystal knows. At approximately 37:10, the agents try again, asking Douglas if he wanted to continuing talking or not. Again, Douglas

continues talking over the agents.

At approximately 37:15, the agents again ask Douglas if he wanted to talk to them without a lawyer or not. Douglas responds that he will talk "for a minute yes, if you will listen to me I will tell you the truth." Douglas then proceeded to tell the agents who he thought he was texting while driving, who has access to his phone, and that his phone passcode is in fact a series of numbers.

At approximately 39:20, the agents asked Douglas to provide the passcode to his phone. Douglas responded, "my lawyers would not appreciate that," without stating whether he has a lawyer, who is lawyer is, or whether he in fact wants a lawyer. As he tended to do during the interview, Douglas quickly offered that he wanted to help. He then said he wanted to go to sleep, but his lawyer told him not to help.

At approximately 40:15, Douglas advised that he does not want to provide the passcode to his phone because if he has to go to trial it will ruin his case. He then proceeded to talk about the how the attorneys from his 2011 case "screwed him."

At approximately 41:10, Douglas explained that he does not want to provide the passcode to his phone because of what happened during his 2011 prior conviction. Seemingly in reference to providing his phone passcode, Douglas stated that he was uncomfortable answering without a lawyer but he does want to help and will need a public defender because "they" (presumably his previous lawyers) have taken all of his money. At this point, the agents asked and Douglas confirmed that he did not want to give the passcode to his phone. Douglas then immediately started again talking about his 2011 arrest and how it did not go well for him.

At a momentary break in Douglas' talking, the agents ask Douglas, "do you still want to continue talking?" at approximately 41:55. Douglas responded, "Well if you have questions I can answer I will, if not, its lawyer so if you are going to stay with the same line of questioning then

we are done." The agents then moved away from the previous subjects and asked Douglas who he sent child pornography to besides the UC.

From this point on, Douglas engaged the agents in conversation for nearly fifteen more minutes. Then, at approximately 56:40, as the agents offered Douglas that being up front and honest could help him down the road, Douglas responded that they should throw his "ass in the clink at this point." He then mumbles something about having "a lawyer to go over this shit, because last time I got fucked by my lawyers" and proceeded to talk about his prior 2011 conviction and how he was innocent.

The agents then told Douglas what he was going to jail for. The two agents and Douglas proceed to talk for another fifty minutes without the word "lawyer" being mentioned again.

### III.   LEGAL ANALYSIS

This Court should deny Douglas' motion to suppress his statements. The defendant argues that his statements should be suppressed because 1) despite law enforcement advising Douglas of his *Miranda* rights, he did not waive his rights orally or in writing; and 2) at approximately thirty-six minutes into the interview, Douglas invoked his right to counsel (DE 47:2). Without citing specific statements, he only offers that he unequivocally invokes his right to counsel. *Id.* at 5.

First, Douglas unequivocally waived his *Miranda* rights and did so voluntarily. He was not pressured, coerced, intimidated, deceived, or threatened. *United States v. Lall*, 607 F.3d 1277, 1283 (11th Cir. 2010). The defendant makes no allegation of any such conduct by law enforcement. He did so, by saying "yes mam" after being asked by the agent if he "understand[s] all of those things," the same agent who had just read each and every *Miranda* right to the defendant. This issue has no merit and the motion should be denied.

Second, despite mentioning the word lawyer or offering when he should have a lawyer, not a single one of Douglas' statements were unequivocal requests for counsel. Moreover, if any of them were considered as such, then any later statements were voluntary.

To stop an interrogation or demand the presence of counsel, a suspect must affirmatively and unequivocally invoke his Fifth or Sixth Amendment rights. *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *Davis v. United States*, 512 U.S. 452, 459 (1994). In other words, the suspect "must articulate his desire to have counsel present" or his decision to remain silent "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney" or to cease further questioning. *Davis*, 512 U.S. at 459. "If the suspect's statement is not an unambiguous or unequivocal request . . ., the officers have no obligation to stop questioning him." *Id*. at 461-62. The assessment of whether a suspect's request is clear or ambiguous depends upon the totality of the circumstances, including "events preceding the request or nuances inherent in the [statement] itself." *Medina v. Singletary*, 59 F.3d 1095, 1101 (11th Cir. 1995) (internal quotation marks omitted).

As noted in the facts above, Douglas never made an equivocal invocation of counsel. Each time he mentioned the word lawyer, the agents attempted to clarify if he wanted counsel as to issues with Crystal or anything else; and each time, Douglas either offered to continue talking or simply ignored the agents' questions and continued talking. At no point does Douglas equivocally invoke his right to counsel. *See Medina*, 59 F.3d at 1105 (holding that it was appropriate for an officer to repeat the question about the suspect's waiver when circumstances rendered the meaning of his response ambiguous or unclear).

The agents did exactly as the Eleventh Circuit and this Court would have them do: clarify the statement. The defendant then, on his own, continued to speak. This cannot be considered an

unequivocal invocation of his right to remain silent.

In the Supreme Court's decision in *Davis v. United States*, the Court held that police questioning of a suspect need not cease until the suspect clearly invokes his right to counsel. An ambiguous request for counsel, such as "maybe I should talk to a lawyer," is not a clear invocation of the right and there is no necessity for the police to clarify the suspect's request. *Davis*, 512 U.S. at 461-62. Instead, a suspect must "articulate his desire to have counsel present sufficiently clearly [so] that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards [v. Arizona*, 451 U.S. at 485], does not require that the officers stop questioning the suspect." *Davis*, 512 U.S. at 459; s*ee United States v. Propst*, 369 F. App'x 42, 46 (11th Cir. 2010) (defendant's statement "I'd rather have a lawyer around to talk" was ambiguous; and did not require officers to terminate questioning).

In *United States v. Ochoa*, No. 16-17609, 2019 WL 5491336, at *1 (11th Cir. Oct. 25, 2019), the Court denied the defendant's motion to suppress and held his post-*Miranda* statements admissible. During the last sentence of the reading of his *Miranda* rights, the officers read to Ochoa, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present". *Id.* at *2. After asking the officer to read the statement again, Ochoa insisted that he did not "really agree with that one" and "you're asking me at this time [if] I'm willing to answer questions without a lawyer. I don't agree with that." *Id.* The officer explained what the statement meant and Ochoa agreed to speak. *Id.* The Court noted that the parties did not dispute the fact that the defendant "did not expressly state that he wished to consult an attorney or remain silent." *Id*. at *17. The Court held that "it was appropriate for [the officer] to ask follow-up questions to clarify what Ochoa meant by his

ambiguous statements." (*Id*., *citing Medina*, 59 F.3d at 1105).  The Court then justified and affirmed the officer's further clarifications to Ochoa: "Once [the officer] offered a brief explanation of the waiver provision, Ochoa quickly assented, further indicating he had only been confused previously and had not invoked his right to counsel or to remain silent." *Id*.

Officers who are unsure if a defendant is invoking his right to counsel, can clarify the defendant's intention or answer questions that the defendant has. Each and every time the agents asked Douglas to clarify if he wanted a lawyer or wanted to stop talking; each and every time, Douglas continued to talk. DOUGLAS did not unambiguously and unequivocally request counsel. His statements were ambiguous and appeared to express his desire to try to sway the agents, or offer that he had poor counsel in his 2011 arrest, or the current case would never make it to court, rather than an unequivocal desire to end the interaction.  *See Lumpkins v. Sec'y, Dep't of Corrs*., 449 F. App'x 879, 885 (11th Cir. 2011) (finding that suspect's statement that he was "through with this" was ambiguous); *United States v. Tran*, 171 F. App'x 758, 761 (11th Cir. 2006) (holding that a suspect's request for his bankruptcy lawyer's business card was not an unequivocal request for counsel); *United States v. Acosta*, 363 F.3d 1141, 1154 (11th Cir. 2004) ("[A]n arrestee's refusal to sign a waiver of rights form is not enough to constitute an invocation of rights.").

Within the defendant's motion, he appears to request a *Jackson* hearing noting that the court "must afford the defendant an opportunity to testify regarding the inculpatory statement out of the jury's presence without prejudice to his right not to take the stand in his defense" citing *Jackson v. Denno*, 378 U.S. 368 (1969) and *Jarrell v. Balkcom*, 735 F.2d 1242, 1252-53 (11th Cir. 1984) (DE 47:3). But *Jackson* and *Jarrell* dealt with a situation where the defendant asserted his statement was involuntary. Douglas does not make that assertion. He does not argue that his recorded, post-*Miranda* statement was forced or coerced, but simply that he invoked his right to

counsel. This lineage of cases misses the mark of defendant's argument.

But even if this Court should find that any or all of the Defendant's statements were in fact unequivocal invocations of his right to counsel, only those particular parts of the interview should be excluded from use at trial. In *Michigan v. Mosely*, 423 U.S. 96, 99-100 (1975), the Supreme Court explained that, after a defendant invokes his right to remain silent, a resumption of law enforcement questioning of that defendant can be permissible. 423 U.S. at 101; *see also Gore v. Sec'y Dept. of Corr.*, 492 F.3d 1273, 1296 (11th Cir. 2007) (explaining that an invocation of the right to remain silent does not preclude all future law enforcement questioning of a suspect). Here, in each instance, the conversation between the agents and Douglas was continued *by Douglas* after the statements about a lawyer. Moreover, Douglas' statements regarding a lawyer dealt with specific issues and not the entirety of the conversation. Thus, the questioning apart from and after these statements was permissible and would be admissible at trial.

## IV. CONCLUSION

The defendant's motion to suppress his post-Miranda interview after his mentioning of the word "lawyer" based upon his argument that he invoked his right counsel should be denied. Those rights were not violated by the agents because Douglas never unequivocally requested counsel. Moreover, Douglas properly waived his *Miranda* rights.

                                                   Respectfully submitted,

                                                   MARKENZY LAPOINTE
                                                   UNITED STATES ATTORNEY

                            BY:     s/Gregory Schiller
                                                   GREGORY SCHILLER
                                                   ASSISTANT UNITED STATES ATTORNEY
                                                   Florida Bar No. 0648477
                                                   500 S. Australian Ave.,
                                                   West Palm Beach, FL 33401
                                                   Gregory.Schiller@usdoj.gov

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing were filed with the Clerk of Court through the CMECF system and thus noticed to all parties attached thereto on July 18, 2024. Exhibit 1 (the audio recorded interview) as referenced therein, were delivered conventionally to the Court on July 19, 2024 and previously provided to defense counsel in the first response to the standing discovery order (DE 22:4, line item 4 – "Interview with Douglas.")

BY:   s/Gregory Schiller_____
      Gregory schiller
      Assistant United States Attorney