**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-80219-CR-CANNON**

**UNITED STATES OF AMERICA,**

       Plaintiff,

**v.**

**MICHAEL GORDON DOUGLAS,**

       Defendant.

_____/

**ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS [ECF Nos. 46–47]**

**THIS CAUSE** comes before the Court upon the following two Motions to Suppress filed by Defendant Michael Gordon Douglas: (1) Motion to Suppress Physical Evidence Seized from Warrantless Search of Vehicle on Arrest Date of December 12, 2023 [ECF No. 46; *see* ECF No. 54 (Refiled Motion)]; and (2) Motion to Suppress Defendant's Recorded Post-Arrest Statements [ECF No. 47].   The Court has reviewed the Motions and the United States' Responses in Opposition [ECF Nos. 60–61].   The Court also held an evidentiary on the Motions, during which the parties stipulated to certain facts as listed in portions of the United States' Opposition to Defendant's Motion to Suppress Physical Evidence, and the United States presented the testimony of Special Agent Bonnie Myers along with three exhibits [ECF No. 60 pp. 2–8 (bottom of page 2 through first two paragraphs on page 8 minus consent paragraph at bottom of page 7); ECF No. 111 pp. 4–11 (clarifying scope of undisputed facts)]; ECF No. 111 (Suppression Hearing Transcript); ECF No. 86 (conventional filing of Defendant's custodial interview, GX1); ECF No. 84-1 (Consent Form, GX2); ECF No. 87-1 (Certified Passport of Patricia Douglas, GX3, Sealed); *see*

ECF No. 94].   Defendant was given the opportunity to move to reopen the evidentiary hearing for the limited purpose of introducing fact and/or expert evidence to support a challenge to the veracity of Patricia Douglas's signature on a consent to search form but did not do so [ECF No. 111 pp. 38–39, 62–63].[1]

Following review, based upon the Court's factual findings and conclusions of law, Defendant's Motions are **DENIED** [ECF Nos. 46–47].

### DEFENDANT'S MOTIONS AND GOVERNMENT'S RESPONSES

Defendant is charged in an eight-count superseding indictment with seven counts of distribution of child pornography, in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1), and one count of attempted enticement of a minor to engage in sexual criminal activity, in violation of 18 U.S.C. § 2422(b) [ECF No. 55].

In the Motion to Suppress Physical Evidence from Vehicle, Defendant seeks to suppress all physical evidence seized from a Toyota Highlander vehicle he was driving when he was arrested on December 12, 2023 [ECF No. 46].   The evidence consists of a black Verizon cell phone found on the driver floorboard of the vehicle, along with various sex-related accessories and items found in the trunk of the vehicle linked to Defendant's alleged enticement of a minor to engage in sexual conduct [ECF No. 60 p. 8; *see* ECF No. 111 p. 68].   In support of the Motion, Defendant contends that officers lacked probable cause to stop the vehicle and that the search was conducted without the consent of the vehicle's lawful owner, Patricia Douglas [ECF No. 46]. The United States defends the search on various grounds: consent to search as provided by Patricia

---

[1] The Court has not considered an affidavit attached to Defendant's Motion to Suppress Physical Evidence Seized From Vehicle [ECF No. 54-1].   Defendant did not make that affidavit part of the evidentiary record at the hearing on Defendants' Motions to Suppress [ECF No. 111 pp. 59–62]. Nor is there any foundation upon which to accept that hearsay statement as reliable evidence for purposes of the instant Motions.

Douglas [ECF No. 84-1 (GX2)]; automobile exception; search incident to arrest; exigent circumstances given Defendant's threatening and volatile behavior during the arrest, including his decision to hold up what appeared to be a real grenade during the standoff with law enforcement following his flight; and the use of the vehicle as an instrumentality of the crime committed [ECF No. 111 pp. 39–60; ECF No. 60].    There is no dispute that officers had probable cause to stop the vehicle.

In the Motion to Suppress Recorded Statements, Defendant concedes that agents issued *Miranda* warnings during the custodial interrogation and that he acknowledged his understanding of those warnings—but he states that suppression is nevertheless warranted because agents did not expressly confirm, after issuing such warnings, that he still wanted to speak to law enforcement [ECF No. 47 p. 2; ECF No. 111 pp. 84–85].    Defendant also asserts that he invoked his right to counsel during the recorded statement at minute 41 to minute 42 of the recording, which in his view should have prompted agents to cease all questioning [ECF No. 111 p. 82 (limiting invocation argument to 41-to-42 minute marker only); ECF No. 47 p. 5].[2]    In Opposition, the United States relies on Defendant's oral waiver, post-*Miranda*, as contained within his recorded statement and disputes Defendant's suggestion that law enforcement was legally required to make an additional statement further confirming his willingness to speak [ECF No. 61; ECF No. 111 pp. 70–71].    With respect to Defendant's purported invocation of his right to an attorney, the United States argues that Defendant made, at most, equivocal and ambiguous references to his desire for a "lawyer" on discrete issues, without ever expressly invoking his right to counsel—and that, even if a proper invocation could be discerned from his equivocal statements, he nevertheless

---

[2] At the hearing, Defendant abandoned his Due Process Clause argument, expressed in his Motion [ECF No. 47], that Defendant's statement was not the product of a free and unconstrained choice [ECF No. 111 pp. 84–85].

continued to reinitiate conversation and speak to the agents despite their attempts to clarify his wishes, yielding no basis for suppression [ECF No. 72–76 (noting agents' lawful efforts to clarify Defendant's statements)].[3]

## FACTUAL FINDINGS

### A.  STIPULATED FACTS

The parties agreed to the following stipulated facts as articulated during the suppression hearing [ECF No. 60 pp. 2–8 (agreeing to stipulated facts as contained starting at the bottom of page 2 through the first two paragraphs on page 8, minus consent-related paragraph at bottom of page 7); *see* ECF No. 111 pp. 4–11 (clarifying scope of undisputed facts)].

The Court reproduces these facts below.

> The detailed facts of this case through and including November 27, 2023 are contained within the criminal complaint (DE 1) (23-mj-8589-RMM). The sum and substance of those conversations are that the defendant solicited what he believed to be the 8-year-old daughter of a 28-year-old woman for sex, whom he met online in a chat room.   In fact, the 28-year-old woman was an undercover HSI agent (UCA) and the child was notional.   Over the course of two months, he distributed child pornography to the UCA on multiple occasions, described the sexual exploits he wished to commit on the child, and sent live images and videos of himself while using the application to commit these acts.

> However, between November 27, 2023 and December 4, 2023 (when the complaint was signed for the defendant's arrest for seven (7) counts of distribution of child pornography), and through his physical arrest on December 12, 2023 in the Southern District of California, additional evidence was gathered and is detailed below.

> In the online communications with the UC, Douglas desired to meet with the notional child to engage in sex with her, describing in horrific, graphic detail, how he wished to rape the child.   In early December he offered to fly to Florida, asserting he had been to South Florida in the past, but later indicated that he would not be able to travel to Florida due to a lack of money.   After the UCA offered that

---

[3] This Order address the Fifth Amendment challenge to Defendant's statement as advanced in Defendant's Motion to Suppress Statements; it does not address additional redactions to that statement as agreed to by the parties or as deemed by the Court to be appropriate for other evidentiary reasons.

she and the notional child would be visiting family in Phoenix, AZ in mid-December, Douglas asked if she could bring the child to California.   The plan was devised to meet somewhere around the Carlsbad, California, area near the Legoland theme park.   This is approximately 15 miles from Escondido, California, where Douglas lived.

On December 4, 2023 Douglas texted the UCA that his phone cracked and he just got a new one.   Upon his arrest, a cracked Verizon phone was found on the driver's side floorboard where Douglas had been sitting.   A second, Verizon phone, was found in Douglas' residence. Both phones contained evidence of his online communications with the UCA and his possession of child pornography. As Douglas planned the sexual rendezvous with the 8-year-old child, he offered that an Air BnB would be best "in case things get loud moans or she cries a little bit.   No matter how gentle I am when I pop her cherry she most likely will cry s bit."   Douglas sent three links to different Air BnBs in San Marcos and Carlsbad, California.   The UCA confirmed she and the child would be in Arizona on December 12, 2023.   Douglas offered that he would be able to take off from work between December 12 and 14, 2023.

On December 10, DOUGLAS texted the UCA that, "My phone is all messed up but this is red and I think [Child1] would look sexy in it" along with a photo which showed a two-piece red lingerie set that was laid out on what appeared to be a brown couch and a set of white or clear anal beads laying on top of the lingerie set.   About 10 minutes later, Douglas sent the UCA a 33-second-long video of himself, nude and masturbating over a two-piece black lingerie set that was laid out on what appeared to be the same brown couch in the photo that the UCA just received. This couch was later observed in Douglas' residence.   In the video, Douglas stated "Mmm. [Child1] is gonna love my cock inside her. [inaudible] this cute little outfit on and wear it for me. And then I'm gonna fuck her in it. You're gonna be so wet aren't you [UC's First Name]? Mhm. You're gonna want Daddy to fuck her won't you? Making me cum inside her, in a few short days."

That same afternoon, the UCA identified several gifts for Douglas to bring the notional child, in an effort to identify the defendant if they met and confirm his intent. When the UCA mentioned a stuffed animal, Douglas replied, "Already done", and added that he bought the child a stuffed unicorn.   In regards to the black lingerie set in the video that he sent, Douglas told the UCA that it may be too big for the child for a few months, "but she'll grow into her with all the cum I fill her with."   Douglas later added that he would be "bringing a speculum too to help keep her open" (a reference to the child's vagina during intercourse).

That afternoon and again the next day, Douglas messaged how he would have sex with the child and that he would have the UCA use a "double headed dildo" on the child as well.   The next day, Douglas inquired if the UCA had in fact arrived in Arizona with the child.

On December 12, 2023, the day of the arrest, Douglas messaged that he had

a mini bullet vibrator and described how he was going to use a double headed dildo on the child.   Then, when the UCA reminded Douglas not to forget to bring the red lingerie and the stuffed unicorn, Douglas stated that he would not forget.

Around 1pm, the UCA texted the address of the hotel in Carlsbad, CA where she and the notional child were staying and expecting Douglas, along with a photo of the lobby.   As the day went on, Douglas appeared to be delaying or stalling as to when he would arrive at the hotel, explaining he had errands to run, had to chauffer his mother around, and drop her off.   As the day wore on, UCA repeatedly asked Douglas if he was for real, to which Douglas responded he was and would be coming to the hotel.   As night fell, Douglas and the UCA spoke on the phone.   He therein explained all the matters he was attending to and why he was running late.   Upon the UC reminding Douglas not to forget the child's gifts, he stated that he had it in the trunk of his car.   At about 6pm, when the UC said she would give the child sugar to stay awake, Douglas messaged, "She'll taste sweet too."

By 6:30 P.M., Douglas had advised the UC he was going to shower and head to the hotel.   7:00 P.M. was the last communication before Douglas was encountered by police.   Surveillance on Douglas that day confirmed him making many stops and driving around a female.   At approximately 7:20 P.M., surveillance units observed DOUGLAS leave his home in the Toyota Highlander. Douglas drove to several different hotels.   At each hotel, he arrived and departed within a few minutes.   After the third or fourth hotel, Douglas increased his speed of travel and was somewhat erratic in his driving patterns.   At approximately 7:45 P.M., Douglas drove the highlander at the corner of W El Norte Pkwy and Seven Oakes Rd.   Agents noticed that amber emergency lights were flashing from the windshield of the Highlander.   As he drove, he passed through intersections against traffic signals and traveled over the speed limit.

Due to Douglas' unusual activity, HSI decided to arrest Douglas as soon as practicable.   As HSI considered Douglas dangerous, given his prior criminal history, and the fact that there were two elderly women living in the residence, they did not want Douglas to re-enter the home and create a barricade or hostage situation.

Agents observed Douglas entering the I-15 freeway northbound from El Norte Parkway with the emergency lights engaged, and exit the freeway at Deer Springs Road. Douglas turned east, then north at City Centre Parkway, and then left into a "park and ride" lot immediately east of I-15.   As multiple HSI vehicles converged on Douglas' location, they activated their emergency lights, and pinned the Highlander from the front and back.

Douglas was ordered not to move and a flash bang was detonated. Immediately thereafter, the front-seat passenger, named Crystal, fell out of the vehicle and began frantically screaming things such as, "he is going to kill us," "he

6

is crazy," and "grenade."[4]  A second flash bang was detonated on the hood of the Highlander, resulting in Douglas ducking down behind the dash of the vehicle. When he sat up, he presented one open palm to the windshield and a closed fist in a menacing manner.   Douglas began shouting with his door closed and window shut.   Agents observed what appeared to be a green, baseball-sized, hand grenade in Douglas' hand.   Agents took evasive positions to shoot Douglas if it appeared he would drop the grenade; but held off shooting him in case he had already pulled the firing pin.

Crystal was removed from the ground outside the Highlander.   She told agents that Douglas threatened to blow the two of them up, as well as throw "it" at law enforcement as they were following the Highlander.   Civilians and other non-law enforcement vehicles were within the immediate area of the incident.   The agents were then able to observe what appeared to be a M67 fragmentation hand grenade.   The agents knew the weapon's kill radius of an uncontained blast to be approximately 16 feet and the injury radius is approximately 49 feet or more.

When all persons had cleared the potential blast zone, HSI directed Douglas to put the grenade down.   After approximately one to two minutes of negotiations and commands between HSI and Douglas, Douglas placed the hand grenade on the dashboard of his vehicle.   Douglas then complied with directions of law enforcement to eventually exit the vehicle.   Douglas was ordered to slowly remove his jacket for fear of additional explosive devices on his person. DOUGLAS was taken into custody.   When handcuffed he made comments such as, "What is this for?   Why is this happening?   This is illegal.   I'm going to sue all of you."   Douglas also stated somebody set him up.

Search of Douglas, incident to arrest, agents found the following on his person: multiple knives, an anal plug sex toy, and a wallet that contained his California identification card, a CashApp debit card for username $ChicagoMikeMGD, as well as other identification.   DOUGLAS did not have a cellular phone on his person.   A bomb technician was brought in to examine the grenade as it sat in the car, which turned out to be fake.   The bomb technician with probable cause to believe other replica hand grenades could be in the vehicle, and with the exigency that others could be harmed by explosives in the vehicle, searched the vehicle and surrounding area for explosive hazards.   The bomb technician found no explosive hazards in the vehicle or in a backpack on the ground near the front passenger door.

---

[4] It was unknown that Douglas had a grenade at that moment or if Crystal was referring to the flash bang that had been detonated.

Upon receiving the signed consent,[5] agents on scene of Douglas' arrest, along with the probable cause, search incident to arrest, and exigency of the explosive devices and weapons found on Douglas, searched the vehicle.   Upon doing so, they found a black Verizon cell phone with a cracked screen on the driver floorboard of the vehicle.   In the trunk of the vehicle, HSI located a green bag that contained a unicorn stuffed animal, red lingerie, a two-piece black lingerie, one-piece black lingerie, a vaginal speculum/dilator (unopened, still in package), a strap-on dildo sex toy, a double-headed dildo sex toy (unopened, still in package), astroglide lubricant (unopened, still in package), a pink mini bullet vibrator, and an anal beads sex toy.

The Verizon phone (along with the digital items found inside the Defendant's home) were shipped to the Southern District of Florida.   They arrived on December 15, 2023, wherein search warrants to search the items were obtained on December 20, 2023 (23mj8609WM and 23mj8610WM) and executed shortly thereafter.

## B. FACTUAL FINDINGS REGARDING PATRICIA DOUGLAS'S CONSENT

The following facts derive from the testimony of Special Agent Myers, deemed fully credible by the Court, and the exhibits presented at the suppression hearing.

1. Special Agent Bonnie Myers is a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI") [ECF No. 111 pp. 20, 35].

2. At the time of the hearing, Agent Myers served in HSI's Child Exploitation Unit and had served as a law enforcement officer for approximately twenty-one consecutive years, the last ten as part of HSI [ECF No. 111 pp. 20, 35].

3. On December 12, 2023, Agent Myers was assigned to be a part of the law enforcement team tasked with executing a post-arrest search warrant of Defendant's residence in California [ECF No. 111 pp. 21–22 (specifying address)].

---

[5] Defendant challenges the United States' factual assertion that Patricia Douglas signed the consent form, but he does not otherwise challenge the scope of the consent form or raise any other argument concerning the application of the consent exception.

4.  Upon entry into Defendant's residence, Agent Myers identified three individuals: Linda Douglas, Defendant's mother; Patricia Douglas, Defendant's aunt; and Adrianne Corirossi, a man whom Defendant claimed had been squatting in his home for several months [ECF No. 111 pp. 22–23].

5.  Agent Myers and another HSI Agent, Cesar Valdivia, spoke to Linda and Patricia Douglas for approximately 20 to 30 minutes in the living room [ECF No. 111 pp. 23–24, 30].    The conversation was very cordial [ECF No. 111 p. 23].

6.  Neither Linda nor Patricia Douglas displayed any difficulty or disabilities understanding the conversation with Special Agents Myers and Valdivia [ECF No. 111 pp. 24–25]. Although Linda Douglas did most of the talking, Patricia Douglas was at all times coherent and displayed a full understanding of the conversation [ECF No. 111 pp. 23, 32–33].

7.  Agents Myers and Valdivia did not draw any weapons, make any threats, or raise their voices during their interactions with Linda and Patricia Douglas [ECF No. 111 p. 25].

8.  During the Agents' conversation with Patricia Douglas specifically, Patricia Douglas affirmed that she was the registered owner of the Toyota Highlander vehicle being driven by Defendant that day [ECF No. 111 pp. 25–26, 30].

9.  In the course of that same conversation, Agent Myers asked Patricia Douglas if she voluntarily granted law enforcement consent to search the Toyota Highlander, and she granted consent—both verbally and in writing as documented in a written form signed by Patricia Douglas [ECF No. 111 pp. 26, 34; ECF No. 84-1 (GX2 (consent form)].

10. Agent Myers filled out portions of the form noting the particulars of the vehicle and witnessed Patricia Douglas physically sign the consent form [ECF No. 111 pp. 28–29, 34].

11. The consent form expressly states that the person consenting "voluntarily and intentionally consent[s] to allow HSI to search my property"; it affirms that consent has been "freely given" without "promises, threats, coercion, or other intimidation"; and it acknowledges that the consenting individual has read the form and understands her rights [ECF No. 84-1].

12. Patricia Douglas never questioned agents about the consent form or sought clarification; she answered yes to the consent inquiry, without qualification; she never expressed any hesitation in the verbal or written consent; and she never withdrew her consent to search the vehicle [ECF No. 111 pp. 26, 29, 31, 34].

13. After obtaining Patricia Douglas' consent to search the Toyota Highlander, agents at the scene of Defendant's arrest searched the vehicle, as referenced above in the stipulated facts.

14. The signature of Patricia Douglas as reflected on her certified passport, dated December 2021, matches very closely the signature on the consent form, executed on December 12, 2023 [ECF No. 111 pp. 36–37; ECF No. 93-1 p. 6 (Passport, GX3); ECF No. 84-1 (GX2)].

15. There is no evidence in the suppression record to undercut the substantial and credible proof presented that Patricia Douglas knowingly signed the consent form authorizing a search of the Toyota Highlander that Defendant was driving when he was arrested.

## C. FACTUAL FINDINGS REGARDING DEFENDANT'S RECORDED STATEMENT

The following facts derive from Defendant's recorded statement to law enforcement, which was admitted as GX1 during the evidentiary hearing [ECF No. 47; ECF No. 86 (conventional filing, GX1)].[6]

---

[6] A transcript of the recording was not available on the day of the suppression hearing, but the United States later prepared a transcript for trial, to be filed on the docket following calendar call

16. On December 12, 2023, starting at 10:39 p.m., HSI Agent Rahman and another agent (Mark) conducted a post-arrest custodial interrogation of Defendant.

17. The interview ended at 12:35 a.m.

18. Defendant was handcuffed during the interview and confirmed that he understood English and had some college education.

19. Early into the interview, after a few uncontested preliminaries, HSI Agent Rahman read Defendant his *Miranda* rights.   She advised him that he had the right to remain silent; that any statement could be used against him in a court of law; that he had the right to consult an attorney before making any statement and to have an attorney present during questioning; and that he could stop the questioning at any time and/or to consult an attorney.

20. After Agent Rahman finished reciting Defendant's *Miranda* rights, Douglas affirmed without hesitation that he understood all of the cited rights, saying "yes mam."

21. In the course of Defendant's statement, Defendant made various incriminating statements and other assertions.   For example, he admitted that he had been talking to "Anna" for a couple of months on the Kik application about Anna's young daughter "Emma"—and specifically about Anna seeking out individuals to have sex with Emma.   He acknowledged sending Anna child pornography and videos of him masturbating; he admitted to receiving child pornography on the Kik application; he admitted having a sexual interest in teenagers and also referenced previously having an interest in younger children; he admitted that the phone found in the vehicle was his phone; and he acknowledged making statements to Anna about the nature of sexual relations with Emma.

on April 29, 2025.

CASE NO. 23-80219-CR-CANNON

Defendant nevertheless claimed that he perceived the entire discussion with Anna to be a joke; he maintained that he was never going to meet up with Emma (although he and Anna discussed a meet-up location); he blamed a man named Adrian for using his various devices; he asserted that the sex toys found in his car were to be used for an adult Halloween sex party; and he offered shifting explanations about the origin and purpose of a stuffed unicorn found in his car, among other statements.

22. At approximately the 33-minute mark, Agent Rahman asked whether Defendant would be willing to take a polygraph to verify his claims of no actual sexual contact with minors. In response to that question, Defendant said that maybe he would agree to do so but that first he wanted to speak to a lawyer about the polygraph.   In light of Defendant's reference to a lawyer, both agents sought repeatedly to clarify whether Defendant still wanted to talk to them and what he meant by his earlier reference to "lawyer," at which point Defendant continued talking over the agents—never asking to stop his statement, to remain silent, or to speak to a lawyer.   As the discussion continued, agents again asked Defendant whether he wanted to continue speaking with agents, to which Defendant agreed and continued talking.

23. At approximately the 39-minute mark to the 42-minute mark—which is the only segment on which Defendant relies to claim he invoked his right to counsel [ECF No. 111 pp. 82–83][7]—Agent Rahman asked Defendant if he would be willing to share his phone password.

---

DEFENSE COUNSEL: Your Honor, upon re-evaluating the tape, I believe that the 41 to 42 is more succinct and accurate a portion.

THE COURT: All right. So, to be clear, your motion with respect to suppression of statements and on the topic of invocation, I should be focusing only on this last excerpt, which starts at approximately minute 41?

At that point, Defendant made a reference to his "lawyers" not appreciating that idea.    But then he continued talking and said that he wanted to help.    Agent Rahman reiterated that it was his choice whether to provide a password.    Defendant responded that he was uncomfortable providing his passcode unless he spoke to an attorney.    Agent Rahman then inquired whether Defendant wanted to continue speaking with them, to which Defendant responded that he did not want to discuss the passcode issue without a lawyer but that he would try to answer the agents' questions about other topics.    So Agent Rahman shifted gears to address other areas, including other devices Defendant may have possessed or used to send child pornography and Defendant's flight from law enforcement that day.[8]    Defendant did not ask for an attorney in reference to any of those topics or ask to stop the interrogation or to remain silent.

24. More broadly, Defendant actively and continuously engaged with agents during the lengthy interrogation, frequently interrupting agents to speak in a rambling and deflective manner, talking over them, and even indicating at the end of the interview—after agents said they were ending the interview—that he wanted to keep talking.

25. At no point did agents act aggressively or with hostility toward Defendant during the interrogation.

---

MR. KIRBY: Yes, Your Honor.

[8] Defendant never provided the passcode during the interrogation.

**LEGAL STANDARDS**

**Fourth Amendment**. The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"   U.S. Const. amend. IV. [9]   To effectuate a reasonable search, law enforcement either must have a search warrant authorizing the search based upon a judicial determination of probable cause or be able to point to an applicable exception to the warrant requirement.   *See, e.g.*, *United States v. Tamari*, 454 F.3d 1259, 1261 (11th Cir. 2006).

The United States invokes five exceptions to the warrant requirement here, although explanation and treatment of three is sufficient to resolve this Motion. [10]

First, a search that is authorized by voluntary consent by a person with common authority over the property is deemed reasonable under the Fourth Amendment.   *See generally Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Matlock*, 415 U.S. 164, 166, 170 (1974). The voluntariness of consent is a question of fact and is measured objectively under the totality of the circumstances.   *See United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001).   Further, if the consent to search is open ended, a reasonable person would have no cause to believe that the search would be limited in some way. [11]   *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

Second, under the automobile exception, police may conduct a warrantless search of a

---

[9] Defendant challenges only the search of the vehicle; he does not argue that officers lacked probable cause to stop the car.

[10] In light of the ample bases authorizing the search of the vehicle in question, the Court finds it unnecessary to address the United States' additional reliance on the search-incident-to-arrest exception or on its conceptualization of a freestanding "instrumentality of the crime charged" theory separate from the automobile exception [ECF No. 60 pp. 9–10, 15].

[11] Defendant does not challenge the scope of the consent, focusing only on whether Patricia Douglas actually signed the consent form [ECF No. 464 p. 2 n.1].

14

lawfully stopped vehicle if two components are met: the car must be readily mobile (which is uncontested here) [ECF No. 111 p. 66]; and agents must have probable cause to believe that the vehicle contains contraband or evidence of a crime.   *E.g.*, *Michigan v. Thomas*, 458 U.S. 259, 261 (1982) ("[W]hen police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody."); *Tamari*, 454 F.3d at 1261. "Probable cause requires that the facts and circumstances within an officer's knowledge and of which the officer has reasonably trustworthy information be sufficient to warrant a prudent man in believing that the person seized is guilty of a crime."   *United States v. House*, 684 F.3d 1173, 1199 (11th Cir. 2012) (internal quotation marks and brackets omitted).   Probable cause deals with probabilities—not legal technicalities—and it requires a practical assessment of the totality of circumstances.   *Illinois v. Gates*, 462 U.S. 213, 231 (1983).   Finally, if law enforcement has probable cause to believe that evidence of a crime will be found in the vehicle (assuming mobility is established), officers may search "every part of the vehicle and its contents that may conceal the object of the search."   *United States v. Ross*, 456 U.S. 798, 825 (1982).[12]

Third, law enforcement may search a vehicle without a warrant if exigent circumstances exist.   Exigent circumstances exist "when the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action."   *United States v. Satterfield*, 743 F.2d 827, 844 (11th Cir. 1984), *superseded by statute on other grounds as stated in United States v. Edwards*, 728 F.3d 1286, 1292 & n.2 (11th Cir. 2013).   Relevant scenarios include "(1) 'hot pursuit' of a fleeing felon; (2) threatened destruction of evidence inside a residence before a

---

[12] Defendant does not challenge the scope of the automobile search—only whether probable cause existed to believe that evidence of a crime would be located within it.

warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to herself." *Matalon v. Hynnes*, 806 F.3d 627, 636 (1st Cir. 2015); *see United States v. Kreimes*, 649 F.2d 1185, 1192 (5th Cir. 1981) (cataloging areas under which exigent circumstances exist, including hot pursuit, a fleeing suspect, danger to an arresting officer or to the public, mobility of a vehicle, and mobility of evidence).   As those conditions indicate, the exigent circumstances doctrine is a narrow one, applying only in circumstances that objectively present "a real danger to the police or the public or a real danger that evidence or a suspect might be lost."   *United States v. Bulman*, 667 F.2d 1374, 1384 (11th Cir. 1982); *see also United States v. Ramos*, 933 F.2d 968, 972 (11th Cir. 1991) (listing factors to consider in weighing exigency).

**Fifth Amendment**.   The Fifth Amendment's Self–Incrimination Clause bars the prosecution from using compelled testimony in its case-in-chief.   U.S. Const. amend. V.   "A statement is not 'compelled' within the meaning of the Fifth Amendment, however, if an individual 'voluntarily, knowingly, and intelligently' waives his constitutional privilege."   *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).

In *Miranda*, the Supreme Court created an exclusionary rule to serve the Fifth Amendment right against self-incrimination, holding that a police officer's failure to administer certain warnings—now commonly called *Miranda* warnings—prior to a custodial interrogation creates a presumption of compulsion rendering the confession inadmissible, without inquiry into voluntariness under the Due Process Clause.   384 U.S. at 444; *id*. at 476 (holding that the requirement of *Miranda* warnings and corresponding waiver of rights is a "prerequisite[] to the admissibility of any statement made by a defendant").   The Court also held in *Miranda* that a suspect subject to custodial interrogation has the right to consult with an attorney and to have

16

counsel present during questioning. *Id.*; *see Davis v. United States*, 512 U.S. 452, 457, 459 (1994). The government has the burden to prove, by a preponderance of the evidence, that a defendant waived his *Miranda* rights knowingly and voluntarily. *Miranda*, 384 U.S. at 475; *see also Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Spring*, 479 U.S. at 574 (quoting *Moran*, 475 U.S. at 421).

In order for a suspect to invoke his right to counsel under *Miranda*, the suspect must do so unequivocally and unambiguously, sufficient for a reasonable officer under the circumstances to understand that the suspect is clearly expressing a desire for counsel. *Davis v. United States*, 512 U.S. 452, 459 (1994) (citing *Edwards v. Arizona*, 451 U.S. 477, 485 (1981)); *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *Smith v. Illinois*, 469 U.S. 91, 97–98 (1984). "If the statement fails to meet the requisite level of clarity," the law "does not require that the officers stop questioning the suspect." *Davis*, 512 U.S. at 459 (citing *Edwards*, 451 U.S. at 477); *id.* at 460 (requiring, for purposes of *Miranda*, a "clear assertion of the right to counsel"); *United States v. Propst*, 369 F. App'x 42, 46 (11th Cir. 2010) (affirming denial of motion to suppress statements where suspect made qualified references to a lawyer but did not clearly request a lawyer in a manner that would have led a reasonable officer to conclude that he was invoking his right to counsel); *United States v. Ochoa*, 941 F.3d 1074, 1099 (11th Cir. 2019) (affirming denial of motion to suppress statements where suspect never unequivocally and unambiguously invoked his right to counsel or his right to remain silent despite making statements that could have been perceived as consistent with an invocation, and where suspect continued speaking with officers after officers asked clarifying follow-up questions). "[W]hen a suspect makes an ambiguous or equivocal statement," however, "it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney," although no such rule of clarification is demanded

under the law.    *Davis*, 512 U.S. at 461–62.    Finally, even when a suspect does invoke his right

to counsel, he may do so in a limited fashion—i.e., only as relates to certain topics or questions—

in which case law enforcement must honor the suspect's request but need not go beyond the limits

of the scope of the invocation.    *See Connecticut v. Barrett*, 479 U.S. 523, 529–30 (1987); *United

States v. Rought*, 11 F.4th 178, 191 (3d Cir. 2021); *United States v. Martin*, 664 F.3d 684, 688 (7th

Cir. 2011). *Cf. Ford v. Hall*, 546 F.3d 1326, 1339 (11th Cir. 2008) (finding no unreasonable

application of clearly established law, where state's highest court affirmed denial of motion to

suppress in the case of a limited invocation of the *Miranda* right to counsel).

## CONCLUSIONS OF LAW

The evidentiary record does not support a basis to grant either of Defendant's Motions to

Suppress.

### A.  Defendant's Motion to Suppress Vehicle Search [ECF No. 46]

Defendant makes two arguments in favor of suppressing the fruits of the vehicle search:

first, that officers lacked probable cause to believe that the vehicle contained evidence of a crime

for purposes of the automobile exception, and second, that Patricia Douglas did not sign the

consent form authorizing a search of the vehicle [ECF No. 46].    Neither argument has merit.

The search of the vehicle was clearly justified under the automobile exception to the warrant

requirement and pursuant to Patricia Douglas' unequivocal consent to search the vehicle as

indicated in a written consent form.    The exigent circumstances exception—to which Defendant

fails to respond—also applies to support the validity of the search.

### 1.  Automobile Exception

As noted, under the automobile exception, police may conduct a warrantless search of a

lawfully stopped vehicle if the vehicle is readily mobile and police have probable cause to believe

that evidence of a crime will be found in the car.    Defendant concedes the mobility of the vehicle, limiting his challenge to the existence of probable cause [ECF No. 111 p. 66; ECF No. 46].    On that basis, the Court concludes that ample probable cause exists to believe—based on the stipulated facts reproduced above, *supra* pp. 4–8—that evidence of criminal enticement of a minor in the vehicle would be located in the Toyota Highlander Defendant being driven by Defendant on the date of his arrest (December 12, 2023).    These facts derive from Defendant's own statements to the undercover officer in the recorded chat messages leading up to and including his arrest on December 12, 2023.    Specifically, (1) Defendant sent various written communications to an undercover officer in the days leading up to the expected meet-up; (2) he told the undercover officer in those communications that he had lingerie he believed Emma would "look sexy in"; (3) he confirmed that he purchased a stuffed unicorn to give to the child along with lingerie that she would "grow into" after having sex with Defendant; and (4) he stated that he would bring a "speculum too to help keep her open."    Then, on the date of the expected meet up (December 12, 2023), (5) Defendant told the undercover officer that he had a vibrator and dildo to use on the child; (6) he acknowledged that he would not forget to bring the physical items discussed earlier (lingerie and stuffed unicorn); (7) he confirmed that he would be going to the pre-arranged hotel location, and (8) most tellingly, when reminded to bring the child's "gifts," *Defendant expressly stated that he had them in the trunk of his car and would be heading to the meet up hotel after taking a shower.*    Contrary to Defendant's suggestion [ECF No. 46 p. 4], this is more than sufficient information, taken from Defendant's own statements leading up to and on the date of arrest itself, to indicate that Defendant would have various items of physical evidence in his car that he intended to use in his attempted enticement of "Emma" to engage in sexual activity.    No further analysis is required.

19

## 2. Consent to Search

A search authorized by voluntary consent is valid.   *See, e.g.*, *Schneckloth*, 412 U.S. at 222.   That is the case here as determined from the credible testimony of Agent Myers and the written consent form introduced into the record [ECF No. 84-1 (GX2)].   *Supra* pp. 8–10 (pertinent factual findings).

As Agent Myers testified, Patricia Douglas is the registered owner of the Toyota Highlander in question.    Defendant does not dispute that she had lawful authority to grant consent over the vehicle.   On December 12, 2023, Agent Myers engaged in a cordial, non-coercive conversation with Patricia Douglas in the living room of the residence during the execution of the search warrant.    During that discussion, Patricia Douglas gave voluntary consent to law enforcement to search the vehicle—both verbal and written—and she did so without hesitation, difficulty, or lack of understanding.   Law enforcement officers never exhibited any coercive, harassing, or threatening tendencies in obtaining her consent.    And the consent form speaks for itself; it lists the specific vehicle (with plate number); it expressly states that the person consenting "voluntarily and intentionally consent[s] to allow HSI to search my property"; it affirms that consent has been "freely given" without "promises, threats, coercion, or other intimidation"; and it acknowledges that the consenting individual has read the form and understands her rights [ECF No. 84-1].

Although Defendant makes an unsupported assertion that Patricia Douglas did not actually sign the form, the reliable evidence in the record shows the opposite, for all of the reasons stated. Nor is there any basis to believe Defendant's suggestion of a forged signature given the close match between the signature on Patricia Douglas's 2021 certified passport and the signature on the consent form.   *Supra* p. 10.

Without any other basis to invalidate Patricia Douglas's voluntary consent, the Court agrees with the United States that law enforcement had proper consent to search the vehicle.

### 3.  Exigent Circumstances

The United States argues—without any rebuttal from Defendant—that the search of the vehicle was authorized on the basis of the exigent circumstances created by Defendant during his flight from law enforcement on the date of his arrest and his threatening use of a grenade (later determined to be a replica) during the takedown [ECF No. 60 pp. 13–15].

The stipulated facts quoted above support the United States' assertion of an ongoing exigency and clear threat to safety at the time the vehicle was seized. *Supra* pp. 4–8.  First, officers had to "pin[]" the Highlander from the front and back in a parking lot to finally stop him from fleeing.   Immediately thereafter, the front-seat passenger fell out of the vehicle and began frantically screaming things such as, "he is going to kill us," "he is crazy," and "grenade." Officers then detonated a second flash bang (after an earlier flash bang), at which point Defendant sat up, began shouting, and held in his hand what appeared to be a green hand grenade.   Agents were prepared to shoot but held off in case Defendant had already pulled the firing pin of the grenade.   As the emergency ensued, the passenger told agents that Defendant threatened to blow himself up (along with the passenger) and throw "it" at the officers—all while civilians and other non-law enforcement vehicles were in the immediate area.   And then agents saw what appeared to be a hand grenade, recognizing its lethal capabilities within a certain distance.   In the midst of all of this extreme conduct, officers convinced Douglas to exit the car; to remove his jacket; and to submit to handcuffs—after which a bomb technician was called to examine the grenade, which turned out to be fake.   Still, the bomb technician had probable cause to believe that the vehicle could contain other explosives that could harm others in the vicinity—prompting an emergency

search of the vehicle for explosive hazards.

On this stipulated record, absent any challenge from Defendant, the Court agrees with the United States that the circumstances created by Defendant through his dangerous and volatile behavior during the takedown authorized an exigent-circumstances search of the car to protect the life and safety of individuals in the parking lot area from the threat of additional explosives.

For these reasons, Defendant's Motion to Suppress Physical Evidence from Vehicle is **DENIED** [ECF No. 46].

### B. Defendant's Motion to Suppress Recorded Statement [ECF No. 47]

The Court next addresses Defendant's Motion to Suppress Recorded Statement [ECF No. 47]. Defendant makes two arguments in the Motion. First, Defendant asserts that, although officers properly read his *Miranda* rights to him and he acknowledged his understanding of the noted rights, officers were required by law to go further and specifically confirm that he acquiesced to speaking to them [ECF No. 47 p. 2; ECF No. 111 pp. 84–85]. He does not provide any authority for this purported extra requirement, which the United States disputes. Second, Defendant argues that at approximately minute 41 of the recorded statement, Defendant unequivocally invoked his right to counsel, warranting full cessation of questioning [ECF No. 47 p. 5 as clarified at ECF No. 111 pp. 82–83 (limiting challenge)]. The United States says no such equivocal invocation was made by Defendant and that officers acted properly and lawfully in seeking clarification of his references to "lawyer" and in honoring his requests.

Upon review of the record, and in light of the Factual Findings above, *supra* pp. 10–13, the Court sees an insufficient basis to warrant suppression of Defendant's recorded statement on Fifth Amendment *Miranda* grounds.

First, HSI Agent Rahman properly read Defendant his *Miranda* rights, including that he

had the right to remain silent; that any statement could be used against him in a court of law; that he had the right to consult an attorney before making any statement and to have an attorney present during questioning; and that he could stop the questioning at any time and/or to consult an attorney. Defendant expressly acknowledged that he understood those rights and made no indication to the contrary.    There is no allegation of coercive conduct in the administration of *Miranda*, nor does the record indicate any such coercion.    On this record, Defendant knowingly waived his *Miranda* rights and agreed to speak to law enforcement.    No additional confirmation of his willingness to speak was required under the law to comply with *Miranda*.

Second, with respect to Defendant's argument that he invoked his right to counsel at approximately minute 41 through minute 42, the Court finds that any such invocation was limited to the topic of providing his password and that officers properly honored that limited invocation and otherwise acted without coercion in continuing the interrogation.    Minutes before the 41-minute mark when Defendant indicated that he did not want to agree to a polygraph without discussing that topic with an attorney, agents properly and carefully sought clarification from Defendant as to his wishes for a lawyer and his desire to continue speaking.    *See Davis*, 512 U.S. at 461–62.    Defendant agreed to continue speaking and kept doing so continuously—without ever clearly invoking his right to counsel or indicating he wished to remain silent.    Then, in the challenged segment starting at approximately minute 41 (the full context begins at minute 39), Defendant did indicate that he did not want to keep talking to agents without a lawyer if they continued asking about his passcode.    But when asked in that moment whether he wanted to continue speaking with agents, he said he would do so provided the questions did not concern the topic of his phone passcode.    That invocation did constitute an invocation—but it was a limited invocation on the subject of the passcode alone—and agents honored it.    *See Barrett*, 479 U.S. at

23

529–30; *Rought*, 11 F.4th at 191; *Martin*, 664 F.3d at 688; *cf. Ford*, 546 F.3d at 1339.    Indeed, agents shifted gears immediately onto other subjects; Defendant did not ask for an attorney in reference to those other topics or ask to stop the interrogation or to remain silent; and there is no record evidence of coercion on the part of law enforcement sufficient to infer a violation of *Miranda*.    Rather, as the lengthy statement bears out, and pursuant to the Court's Factual Findings above, Defendant actively and continuously engaged in discussion with the agents until the agents decided to end the interview over Defendant's disagreement.    *Supra* p. 13.    This is not a record indicative of unconstitutional or reckless police conduct.

Defendant's Motion to Suppress Statements [ECF No. 47] is also **DENIED**.

### CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1.   Defendant's Motion to Suppress Physical Evidence [ECF No. 46] is **DENIED**.[13]

2.   Defendant's Motion to Suppress Recorded Post-Arrest Statements [ECF No. 47] is **DENIED**.[14]

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 30th day of April 2025.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

---

[13] As noted, the Court finds it unnecessary to address the United States' additional reliance on the search-incident-to-arrest exception or on its conceptualization of a freestanding "instrumentality of the crime charged" theory [ECF No. 60 pp. 9–10, 15].

[14] As noted, this Order addresses the Fifth Amendment challenge to Defendant's statement as advanced in Defendant's Motion; it does not address additional redactions to that statement as agreed to by the parties or as deemed by the Court to be appropriate for other evidentiary reasons.

24